# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

-------------------------------------------------------------------- x

SAMIR R. KHOURY,        :   Case No.  4:25-cv-5570

          Plaintiff,       :

       -against-        :   **COMPLAINT**

KBR, Inc.,               :

         Defendant.      :   JURY TRIAL DEMANDED

-------------------------------------------------------------------- x

Plaintiff Samir R. Khoury, by and through his undersigned counsel, alleges as follows against Defendant KBR, Inc. ("KBR"):

## NATURE OF THE ACTION

1.     Mr. Khoury brings this action against KBR because KBR caused Mr. Khoury to become subject to criminal investigation and indictment for crimes he did not commit. Those criminal proceedings took a hammer and tongs to Mr. Khoury's career, freedom, and life. Only last year was the cloud cleared from Mr. Khoury's name. The ensuing paragraphs describe the basis for Mr. Khoury's claims.

2.     From 1977-2004 Plaintiff Samir Khoury faithfully served the M.W. Kellogg Company ("Kellogg") and its successor KBR, primarily as a sales executive in the Middle East and as Vice President of Sales for Kellogg Middle East Ltd., and later as an independent consultant. Mr. Khoury successfully helped Kellogg and KBR (jointly referred to herein as "KBR") identify and procure contracts for Engineering, Procurement, and Construction ("EPC") projects across the globe focused on the chemical, fertilizer, and petrochemical industries.  Beginning in 1988, as an

1

independent consultant, Mr. Khoury worked to develop the commercial groundwork for a new set of ventures for KBR. He persuaded KBR to depart from its traditional, conservative practice of bidding only on cost-reimbursable contracts, which were a low-risk, low-profit margin bet, and to bid on higher-risk, higher-profit margin lump sum turnkey ("LSTK") projects, which ultimately redounded to KBR's significant financial benefit. In so doing, Mr. Khoury brought to KBR's doorstep the opportunity to engage in the successful and profitable pursuit of LSTK contracts for the engineering and construction of Liquefied Natural Gas ("LNG") projects.

3.      Over a fifteen-year period spanning roughly 1988-2003, Mr. Khoury was the driving force behind KBR's entry into several enormous LSTK LNG construction projects in Malaysia, Egypt, Yemen, and Indonesia, which brought in billions of dollars of revenue and earned KBR tremendous profits. KBR was obligated to reward Mr. Khoury's work with success-based commissions, which it did in dollar amounts that, although handsome, were a fraction of the 3-5% project-value commission rate that was the industry standard for the work Mr. Khoury performed. Mr. Khoury accepted the bargain rates both out of loyalty to KBR and because he reasoned that after a few more years of proving himself, he could later demand full market-rate remuneration.

4.      In 2003, revelations emerged that KBR, its former CEO, Albert "Jack" Stanley ("Stanley"), and three other KBR joint-venture partners had allegedly bribed Nigerian officials to win contracts to construct LNG plants. The U.S. Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission ("SEC") opened investigations into the alleged wrongdoing, focusing on potential violations of the Foreign Corrupt Practices Act ("FCPA"), the securities laws, and other U.S. criminal statutes. Those investigations ultimately resulted in Stanley entering a plea of guilty on September 3, 2008, followed over the next few years by numerous other related guilty

pleas, deferred prosecution agreements, consent agreements, and settlement agreements involving the DOJ, SEC, KBR, its other joint-venture partners, and associated individuals.

5.      Mr. Khoury was never involved in the bribery of Nigerian officials, nor were such allegations ever leveled against him. Mr. Khoury advised KBR in the mid-1990's on the commercial aspects of the Nigerian LNG joint-venture leadership, evaluated the LSTK EPC risk factors, and determined the optimal competitive commercial proposal conditions, such as project schedule guarantees, limitations of contract liability, payment terms, and pricing levels.   Mr. Khoury's recommendations proved beneficial to KBR and the KBR joint venture won the contract. Mr. Khoury believes that KBR's bid would have prevailed even in the absence of Stanley and KBR's criminal attempts to bribe Nigerian officials that later came to light, rendering Stanley and KBR's bribery scheme not only a blunder but a self-destructive, pointless, and absurd blunder.

6.      An investigation by French authorities into KBR and its joint-venture's conduct in the Nigeria LNG Project turned up bank records showing transfers of sums from accounts of Mr. Khoury's consulting companies to accounts held by Stanley. When KBR learned about those payments, it began to shape a narrative, which the DOJ later adopted, that Mr. Khoury – who had become esteemed throughout KBR for his unique acumen in identifying EPC LNG projects, assembling joint-ventures, and targeting winning bid ranges – had conspired with Stanley to unjustly enrich themselves at KBR's expense. KBR concocted a "kickback" story that Mr. Khoury and Stanley secretly agreed to steer projects to Mr. Khoury's consulting companies so that those entities would receive large commissions that Mr. Khoury's work otherwise would not have merited, in return for which Mr. Khoury's consulting companies would share the commissions with Stanley.

7.      The "kickback" claim was implausible to those familiar with Mr. Khoury and his work for at least three reasons, all of which KBR well knew: (i) KBR recognized and celebrated Mr. Khoury throughout the company for his meritorious work; (ii) KBR paid Mr. Khoury commissions for his work that, in truth and fact, were *below* market rate; and (iii) Mr. Khoury identified projects and proposed them to KBR as a company so it was not possible for Stanley to personally and clandestinely steer contracts to Mr. Khoury's consulting companies, not least because many high-level KBR executives were involved in approving the agreements with Mr. Khoury's consulting companies.

8.      The transfers to Stanley's accounts were not "kickbacks" at all; they represented amounts that Stanley had extorted from Mr. Khoury over a period of several years during which Stanley was one of the most powerful individuals within KBR, and by extension, within the global EPC industry. Stanley had the power and influence to crush Mr. Khoury's career, and he used the long shadow cast by his power and influence to wrongfully claim money that Mr. Khoury had legitimately earned. KBR never acknowledged that it had allowed Stanley to run amok in this fashion against Mr. Khoury (or others), preferring instead to hew to the twisted narrative that Mr. Khoury was in league with Stanley to wrongfully siphon money that KBR claimed belonged to it.

9.      KBR's preferred narrative publicly emerged when the DOJ announced its plea agreement with Stanley on September 3, 2008.[1] The headline story, and the DOJ's primary claim, featured Stanley's salacious conduct as the central node in a network of individuals and companies involved in a nearly $200 million scheme to bribe Nigerian officials. Awkwardly appended to Stanley's plea was a second count describing a $10.8 million "kickback" scheme that purportedly

---

[1] See *Former Officer and Director of Global Engineering and Construction Company Pleads Guilty to Foreign Bribery and Kickback Charges*, United States Department of Justice, Press Release (Sept. 3, 2008), available at https://www.justice.gov/archive/opa/pr/2008/September/08-crm-772.html.

involved Stanley receiving secret payments for hiring an "LNG Consultant" on various other KBR-helmed LNG projects.[2] The plea agreement did not explicitly name Mr. Khoury, but it provided sufficient personalized detail for his friends and colleagues in the EPC/LNG industry to understand that Mr. Khoury was the "LNG Consultant" under the DOJ's microscope. That fact was confirmed when numerous colleagues reached out to Mr. Khoury after learning of Stanley's plea and it was later reconfirmed when news reporters also sought to contact Mr. Khoury, believing him to be the "LNG Consultant."

10.     On November 24, 2008, the DOJ filed under seal an indictment naming Mr. Khoury as the defendant and charging him with entering into a conspiracy with Stanley to unjustly enrich themselves at KBR's expense. Because the indictment was filed under seal, Mr. Khoury could not be certain of its existence but given the characterizations of the "LNG Consultant" in Stanley's plea, and the DOJ prosecutors' public statements of intent to pursue the "LNG Consultant," Mr. Khoury strongly (and correctly) suspected the indictment's existence. Mr. Khoury fought for years to have any charges secretly filed against him unsealed and prevailed finally on July 9, 2018. Mr. Khoury then fought for years to have the indictment dismissed. In 2024, after the death of Stanley, who was the DOJ's only witness of consequence against Mr. Khoury, and after Mr. Khoury's counsel met with the DOJ to explain the numerous flaws in its prosecution theory, the DOJ agreed to dismiss all charges pending against Mr. Khoury with prejudice. The court dismissed Mr. Khoury's indictment on November 20, 2024, whereupon Mr. Khoury's name was finally cleared after more than fifteen years of investigation, innuendo, and indictment, which KBR had forced, fed, and facilitated.

---

[2] *U.S. v. Stanley*, Case No. 4:08-cr-00597 (S.D. Tex.) ("*Stanley*") (ECF No. 9 at 17-18).

11.    KBR's business was not dramatically damaged by the Nigerian bribery scandal, despite its central role, and it is still among the top EPC firms in the world.[3] The result for KBR of having Mr. Khoury placed under investigative scrutiny and indictment was that it saved over $20 million in outstanding fees it owed to Mr. Khoury's consulting company; it could claim it "cleaned house" of anyone involved in the Nigeria LNG project and was starting with a new slate; and it also positioned itself as a "victim" entitled to receive restitution from Stanley in the amount of $10.8 million he had stolen from *Mr. Khoury*, not from KBR.

12.    Mr. Khoury's life was ineradicably altered by the Nigeria scandal, despite the fact he was not involved in that scandal at all. The result for Mr. Khoury was the ruin of his reputation and his career, significant mental anguish, near-total inability to travel outside of his native country of Lebanon, mountains of legal defense bills, and years of lost income during what should have been the prime of this career.

13.    As further discussed herein, Mr. Khoury asserts this action against KBR for the harm he has suffered and damages he is owed because of KBR's improvident and malicious procurement of the DOJ's investigation and subsequent prosecution of Mr. Khoury.

## PARTIES

14.    Mr. Khoury is a dual citizen of the United States and the Republic of Lebanon, currently residing in Lebanon.

---

[3] *See*, *e.g.*, Aditi Kumar, *Top 14 Oil and Gas EPC Companies in the World*, IMARC.COM, https://www.imarcgroup.com/oil-and-gas-epc-companies (last visited Nov. 18 2025) (ranking KBR number 5 of 14); *see also*, Blackridge Research & Consulting, What Is EPC in Oil & Gas? Top 10 EPC Companies in 2025 https://www.blackridgeresearch.com/blog/epc-in-oil-and-gas-industry-firms-companies?srsltid=AfmBOoodVPbftDFImNhv2IfNVoi3Eo4e1OTGbkp2uWCak2Wbgb_4SRpp (last visited Nov. 18 2025).

15.     KBR, Inc. is a Delaware-registered corporation with its headquarters and principal place of business located at 601 Jefferson St. Houston, Texas 77002.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and/or 1332(a)(2) because complete diversity of citizenship exists between the parties and the matter in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Khoury's claim occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Background of the Relationship Between Mr. Khoury and KBR

#### A.  Mr. Khoury's Early Sales Career and Transition to Independent Consultant

18.     Mr. Khoury is a native of Lebanon. He came to the U.S. in 1971 to attend college, receiving a bachelor's degree in chemical engineering and a second bachelor's degree in French from Cleveland State University in 1975. In 1976, the U.S. granted citizenship to Mr. Khoury.

19.     After graduating, Mr. Khoury joined Houston-based Kellogg in 1977, where he remained employed until 1988. He worked overseas for Kellogg in international sales, where his duties involved seeking and obtaining EPC contracts for Kellogg for oil refineries, chemical fertilizer plants, petrochemical plants, and LNG plants. He worked his way up in Kellogg's sales division and ultimately became a Vice President of Sales of Kellogg Middle East Ltd., responsible for managing EPC sales for Kellogg across the Middle East and Africa. In 1983, Mr. Khoury, then stationed in Dubai, began reporting to Stanley, who was at that time the company's Far East Vice President of Sales.

20.      From 1977 to 1988, Mr. Khoury became one of Kellogg's most accomplished sales representatives, securing major projects for the company. In the construction industry, major projects are generally contracted for in one of two ways: cost-reimbursable or LSTK. In general, a cost-reimbursable contract is an agreement under which the contractor is reimbursed legitimate project costs incurred, plus an additional fee reflecting company overhead and profit. By contrast, an LSTK contract is principally fixed-price at the outset, and it includes all the costs of engineering, materials, construction, commissioning and startup, meaning the contractor assumes the risk of cost overruns but it also could realize far greater profits if the actual costs it incurs are lower than estimated. Kellogg's organizational philosophy had reflected a preference for cost-reimbursable contracts, leaving the risk of cost overruns to the project owner. The projects Mr. Khoury secured early in his career with Kellogg generally cost-reimbursable.

21.      Mr. Khoury sought innovative ways to get Kellogg involved in projects where the owners insisted on LSTK contracting. Those were projects that Kellogg would not have otherwise bid on because of its view that the profit-risk calculus was intolerable. Mr. Khoury worked hard to develop a reputation for diligence and integrity and, consequently, he was able to establish numerous relationships of trust with major players throughout the EPC industry, in particular with Japanese companies such as Hitachi Zosen Corporation ("Hitachi"), Kawasaki Heavy Industries Corporation ("Kawasaki"), JGC Corporation ("JGC") and Chiyoda Corporation ("Chiyoda"). That hard work paid off when Kellogg was awarded a fertilizer plant project in Iraq in 1985. Mr. Khoury was able use the industry relationships he had developed to help assemble a joint-venture partnership among Kellogg and two Japanese companies, including Hitachi, that bore the entire LSTK contract risk but also allowed Kellogg to participate in a potentially very profitable LSTK contract. Moreover, Mr. Khoury achieved this result after numerous trips at great personal peril to

an active war zone in Baghdad, staying there weeks at a time during the Iran-Iraq war. Kellogg's

then-President, Don Vaughn ("Vaughn"), singled out Mr. Khoury for praise both in a personal note

and in a company-wide announcement, after Kellogg was awarded the project:

> I would like to thank everyone involved in making this contract possible with special thanks to Samir Khoury for his long dedicated efforts. This is a contract for a major worldscale fertilizer complex which was won after intensive international competition. My congratulations to all involved.[4]

Other Kellogg employees, from the CEO down to the staff, wrote personal notes of appreciation,

recognizing Mr. Khoury's efforts. KBR's joint-venture partner, Hitachi, similarly praised Mr.

Khoury for his "extreme contribution and right guidance" in landing the contract.[5] This success

was remarkable both because Iraq was a difficult, contractor-unfriendly market, and because the

project was unusual at the time for Kellogg since it was bid and awarded on an LSTK basis. The

Iraq project for Kellogg marked a turning point into an era that would come to yield great profits

for Kellogg and, later, KBR based on LSTK contracts to construct LNG plants over the next two

decades.

22.     Mr. Khoury resigned from Kellogg in 1988 to pursue a career as an independent

consultant. With the Iraq project, he had proven that he could bring parties together to align their

interests to jointly pursue large projects. Further, he perceived a burgeoning interest in LNG

developments and foresaw numerous projects in the offing. He wished to help Kellogg see the

value in participating in these projects. The reward for Mr. Khoury would be receipt of success-

based commissions on projects that he helped land, which fees generally ranged from 3-5% of the

total LSTK contract amounts. The choice to leave Kellogg, however, was not without risk. Mr.

Khoury was abandoning a promising career as a senior sales executive with the security of a regular

---

[4] D.C. Vaughn, Kellogg President, Announcement (April 16, 1985).

[5] K. Otsuki, Hitachi, Letter to Samir Khoury (March 18, 1985).

paycheck to venture out on his own. If the projects he proposed did not come to fruition, he would receive no commission.

23.    If successful, Mr. Khoury's move represented a win-win proposition: Kellogg would realize great profit from participating in projects it otherwise would not bid on its own, and Mr. Khoury would receive a commission for successfully brokering the deals. Over the ensuing years, Mr. Khoury remained loyal to, and continued to work chiefly with, Kellogg (and later KBR).[6] KBR appointed Mr. Khoury to represent it in the pursuit and performance of both LSTK and cost-reimbursable contracts for projects in the petroleum-refining, petrochemical, fertilizer, and gas-processing industries – including LNG and Gas to Liquid ("GTL") contracts – starting in the Middle East in 1988, and then later expanding his territory to Africa and the Far East in 1998 and further expanding into South America in 2003.

**B. The Consulting and Commission Agreements with KBR**

24.    From 1988 through 2004, Mr. Khoury was the individual engine behind dozens of opportunities for KBR, advising KBR through consulting agreements it signed with Mayfair International, Inc. ("Mayfair") from 1988-2002 and with Gulfbridge, Ltd. ("Gulfbridge") from 2003-2004, and Mr. Khoury further operated for Kellogg and KBR under success-based commission agreements, chiefly through Gulf Commercial Agencies, Ltd. ("GCA") but also through Salam Trading Co. ("Salam") and Gulfbridge. Mayfair, Gulfbridge, GCA, and Salam were the corporate entities through which Mr. Khoury conducted his consulting business.

25.    KBR approved dozens of separate agency, consultancy, and/or success-based commission agreements relating to projects that Mr. Khoury helped spearhead. The relationship

---

[6] Kellogg merged with Brown and Root, a subsidiary of Halliburton Co., to form KBR in 1998. In 2006, KBR separated from Halliburton Co. to become an independent corporate entity. Where "Kellogg" is not specifically identified herein, "KBR" is used to refer to both Kellogg and KBR, including for allegations that refer to or include the period before the 1998 merger between Kellogg and Brown & Root.

was governed by ten (10) successive general consulting agreements that ran for terms of between one year and five years, and by twenty-four (24) project-specific agreements. KBR paid monthly retainer fees for general consultancy services that started at $5,000 in 1988 and ranged up to $8,000 by 2004.

26.    Each of those general consultancy agreements contained a provision with substantially similar language that required KBR to enter into a supplemental agreement to pay a commission for projects that Mr. Khoury proposed and KBR agreed to undertake:

> Either Consultant or Kellogg may propose specific projects to be covered by the terms of this Agreement. Kellogg and Consultant shall meet prior to submittal of proposals for projects in the Territory [e.g., specified Middle East countries] and shall decide as to whether or not a supplement to this Agreement is appropriate. It will be Kellogg's unilateral right to refuse to propose upon any project. However, **when Consultant and Kellogg agree to work together upon any project, Consultant and Kellogg will enter into a formal written supplement to this Agreement that will, among other matters, describe the commercial basis for payment** for Consultant's services with respect to such project.[7]

27.    Consequently, Mr. Khoury worked on KBR's behalf to develop project proposals, and, in exchange, KBR committed to enter into a supplemental project-specific agreement setting the amount of the commission and the terms of payment.

28.    KBR had the unilateral right to refuse to submit a bid for any proposed project, in which event no commission agreement would be signed and no commission would be paid. KBR was not obligated to bid on projects that Mr. Khoury proposed.

29.    The obligation to enter into a supplemental success-based commission agreement was triggered only when KBR decided to bid on a project identified by Mr. Khoury, after putting the prospect through a comprehensive internal review and obtaining the approval of a committee of senior executives called the "IRC" (Inquiry Review Committee).

---

[7] *See* General Consultancy Agreement between Kellogg and Mayfair, dated July 15, 1988, ¶ II.B (emphasis supplied).

30.     Pursuant to this arrangement, KBR committed to pay a commission based upon total contract value for projects that Mr. Khoury identified and helped KBR to procure.

31.     The commission amounts ranged from $10,000 for small, awarded contracts up to $10-$15 million for contracts that exceeded $1 billion in value. Expressed on a percentage basis, KBR committed to pay commissions ranging from 0.45% to 5% of contract value on projects that Mr. Khoury proposed, depending upon the type and profitability of a project and the depth and value of the consultancy work he provided.

32.     At least four separate corporate officers of KBR approved each success-based commission agreement and KBR generally approved these agreements only after KBR had already been awarded the contract for the project. No commissions were agreed or paid on the large, joint-venture LNG projects without the full benefit of retrospective evaluation and approval by executives of both KBR and its joint-venture partners.  This KBR protocol ensured that no single KBR executive could award a success-based commission agreement to Mr. Khoury, and that KBR received the full benefit of Mr. Khoury's years-long work in developing favorable project proposals before the success-based commission agreements were approved by a panel of senior KBR officers.

33.     The commissions were a bargain for KBR, and KBR paid no fee or commission if the project was canceled or if the bid was lost to competitors. On the large-scale LNG projects that became a hallmark of Mr. Khoury's efforts for KBR, it never paid a commission that exceeded 1% of the project's value, even though KBR regarded as standard a fee in the range of 3-5% for such projects. For instance, in 2003 when approving the agency agreement with GCA for the Indonesia Tangguh LNG Project, Christopher McDonald, KBR's Vice President for Major Projects, remarked that the $10 million commission for GCA was "quite low … $10 million on [a] $1.5

billion [project] is less than 1%. Nigeria sometimes runs in the 3-4% range." Later, in discussing the Yemen LNG project, Mr. McDonald noted that the "final agreed fee for the consultant was 4% of [a contract value of $1.5 billion] … Therefore, the original requested fee was 4% of [$1.5 billion,] or $60 million." GCA, nonetheless, was to be paid a maximum of $10 million for its commission. Similarly, the request to approve a $10 million success-based commission for GCA on the $1 billion Egypt-Segas Project recited that "[t]he total of agency agreements for the project will be less than 5% of the total JV contract value." GCA's portion of the commission, however, was 1% of the total contract value.

34.     In 1995, Stanley told Mr. Khoury that KBR would not approve any commissions for Mr. Khoury that exceeded $10 million per project, regardless of the project size and despite the understood market rate of 3-5%. Mr. Khoury did not know whether Stanley was authorized by KBR to impose this limitation, but he accepted these below-market rates because he believed many more opportunities would arise in the future, which he felt confident he could assist KBR in successfully bidding. Mr. Khoury also believed that Stanley would soon retire and would no longer be able to dictate inequitable terms. Mr. Khoury reasoned that he was "earning his stripes" as he was about to enter the prime of his career and that in due time the commissions would align with the standard industry rate of 3-5%. As discussed in section II.B below, Stanley's further extortionate demands to be paid portions of those already-reduced fees added insult to injury.

### C.  Mr. Khoury Develops an Excellent Reputation in the EPC/LNG Industry

35.     Mr. Khoury became well-known and highly regarded within the EPC/LNG industries. Mr. Khoury's expertise, knowledge, and industry contacts were invaluable because LNG projects are particularly complex, the number of contractors experienced and qualified to carry out LNG projects is limited, and the number of individuals who had the relationships of trust

that Mr. Khoury possessed to successfully broker joint-venture opportunities between and among sophisticated, competing international firms was few. KBR sales executives responsible for the Middle East and other markets sought Mr. Khoury's services and advice, and Mr. Khoury became involved in most of the Middle East projects that KBR pursued from 1988-2004. Although Mr. Khoury's chief focus was with KBR, other engineering and construction companies also retained him to render consulting services for EPC and/or LNG projects.

36.    Mr. Khoury obtained testimony from former KBR executives and consultants that evidences the high regard in which Mr. Khoury was held for his expertise and knowledge in bringing together project partners and assembling successful bids; that testimony further reinforces that the commissions KBR agreed to pay were below the standard range paid to consultants. For instance, Gregory Trostel, who was an executive with Kellogg from 1987-1997 and KBR from 2003-2004, testified that Mr. Khoury was KBR's "primary consultant in the Middle East"[8] and that he had worked with Mr. Khoury on LNG and oil field projects in Qatar, Abu Dhabi, Egypt, Iraq, and Kuwait.[9] According to Mr. Trostel, Mr. Khoury was "considered an expert in the region," and "was well thought of from the CEO level down to the sales representative level," including for his reputation for honesty and integrity.[10]  As to the typical level of success-fee commissions paid to consultants, Mr. Trostel testified that "[t]he normal scale would be 2 to 5 percent across [the Middle East, Africa, and Far East] regions."[11] Commissions on this scale reflected in part the inherent danger of the areas to which frequent travel was required to pursue the projects,[12] but it

---

[8] Deposition Transcript of Gregory Trostel, dated April 22, 2016 ("Trostel Dep.") at 42:7-8.

[9] *Id*. at 43:5-20,

[10] *Id.* at 44:9-45:1.

[11] *Id*. at 56:20-57:12.

[12] *Id*. at 58:5-10.

also reflected the fact that Mr. Khoury's efforts were "critical" to such projects because he "was very well respected and had [an] extremely high level of connections with each of [the] companies" involved in the project proposal.[13] In Mr. Trostel's view, "there aren't too many people who would have been able to get all of those companies sitting together at the same table, and [Mr. Khoury] was unique in that … he had the relationships across the board and the influence to get them to even start the discussion."[14]

37.     KBR's former Middle East Consultant Guy Gerro testified similarly on these points. Mr. Gerro possessed extensive experience consulting for contractors on a commission/success-fee basis in the Middle East and Africa from approximately 1976-2005.[15] Mr. Gerro testified that KBR had awarded him a contract in January 2004 for consulting on potential Iraq projects, paying a $10,000 monthly retainer for two years plus 2% of the revenues on any project he helped procure for KBR.[16] Mr. Gerro testified that "good and reliable consultants" were "very hard to find" and that during his career as a consultant the going commission rate paid by companies pursuing LNG projects in the Middle East and Africa was "not less than 3%."[17] Regarding Mr. Khoury, with whom Mr. Gerro worked on several projects in the Middle East, Mr. Gerro testified that everyone from the top of the project down to the basic engineer "had very high respect for him. I was astonished to see that because it is very seldom to find someone who would command such respect. He was very highly regarded as an individual and also as a consultant because his opinion was highly appreciated."[18]

---

[13] *Id*. at 61:22-62:10.

[14] *Id*. at 62:10-15.

[15] Deposition Transcript of Guy Gerro, dated May 11, 2016 ("Gerro Dep.") at 11-16.

[16] *Id*. at 46:8-48:17.

[17] *Id*. at 33:9-34:19.

[18] *Id*. at 41:22-43:3.

38.     Contemporaneous emails tell a similar story. On March 17, 2003, after KBR was awarded a $1.6 billion contract for an LNG project in Indonesia, its Asia-Pacific salesman Martin Siddle wrote to Mr. Khoury:

> Many thanks to you for all the terrific support. Could not have done this without you sir! Always a pleasure to work with a gentleman and I hope we can continue to build on this success over many years and prospects to come.[19]

KBR's joint-venture partner on the award of the Indonesia project, JGC, was of the same mind, as reflected in the note of its deputy general manager Kazunori Nito, who wrote:

> I real[l]y wish to express my sincerest appreciation to your great efforts and your kind/timely advice, suggestions made during [the] last moment in Yokohama and Houston. … Your continued cooperation will be much appreciated.[20]

39.     It is a matter of record that Mr. Khoury's efforts bore significant fruit for KBR. In addition to numerous smaller projects, Mr. Khoury identified and developed several enormous LNG projects that were awarded to KBR:

(i)     Malaysia Dua LNG (1992) — $1.7 billion contract; $500 million estimated profit; agreed commission of $15 million (0.88% of contract value).

(ii)     Malaysia Tiga LNG (1999) — $1.6 billion contract; $400 million profit; agreed commission of $10 million (0.625% of contract value).

(iii)     Egypt Segas LNG (2002) — $1 billion contract; $100 million profit; agreed commission of $10 million (1.0% of contract value).

(iv)     Yemen LNG (2002) — $2 billion contract; >$300 million profit; agreed commission of $10 million (0.5% of contract value).

---

[19] March 17, 2003, email from Martin Siddle to Samir Khoury.

[20] March 19, 2003, email from Kazunori Nito to Samir Khoury.

(v)    Indonesia Tangguh LNG (2003) — $1.6 billion contract; >$300 million

profit; agreed commission of $10 million (0.625% of contract value).

Mr. Khoury's efforts yielded *billions* of dollars in revenue. KBR, nonetheless, paid discounted

commissions on the Malaysia Dua, Malaysia Tiga, and Egypt-Segas Projects, and it never paid the

agreed fees on the Yemen and Indonesia Projects, which amounted to at least $20 million it kept

for its own account.

40.    Mr. Khoury was well known, well liked, and highly respected throughout the KBR

organization and the EPC/LNG industry. His efforts, rewarded at bargain rates, yielded substantial

profits for KBR. The consulting relationship continued prosperously for KBR for over fifteen

years—until the DOJ began investigating KBR's business practices in Nigeria.

## II.    The Nigerian Bribery Investigations and the Fallout for KBR and Mr. Khoury

### A.    KBR and Stanley Investigated and Charged with Federal Crimes Arising from Contracts in Nigeria

41.    In late 2003, reports emerged that French authorities were investigating the conduct

of the "TSKJ" joint venture, which comprised Technip SA ("Technip"), Snamprogetti Netherlands

B.V. ("Snamprogetti"), KBR, and JGC, in relation to LNG facilities that the TSKJ joint venture

had constructed at Bonny Island in Rivers State, Nigeria.[21] According to reports, George Krammer,

a former executive of joint-venture partner Technip, was under investigation by French authorities

for a different bribery scheme and offered evidence of the TSKJ joint venture's Nigerian scheme

to defray his punishment.[22] This prompted an investigation by the Paris prosecutor beginning in

October 2002, which was later transferred to a renowned investigative magistrate, Renaud van

---

[21] See Michael Isikoff & Mark Hosenball, Terror Watch: Another Halliburton Probe, NEWSWEEK WEB EXCLUSIVES, Feb. 4, 2004, available at https://www.newsweek.com/terror-watch-another-halliburton-probe-131161.

[22] *Id.*

Ruymbeke.[23] The French authorities' investigation zeroed in on Jeffrey Tesler, who was the TSKJ joint venture's agent, and tracked payments that Tesler received and made in relation to the Nigerian scheme, resulting in the discovery of payments to Stanley.[24] KBR became aware of this investigation in or before 2003.

42.     By 2004, the DOJ and the SEC had begun to question KBR about the findings emerging from the French investigation, such as the payments made to a Swiss bank account in Stanley's name, and began to examine KBR and its former CEO, Stanley, for possible violations of the FCPA and other U.S. statutes.[25] The DOJ and SEC's inquiry was publicly confirmed no later than March 8, 2004, in the Form 10-K that Halliburton Co. (KBR's former parent company until 2006) submitted to the SEC.[26] The 10-K disclosure relayed that the TSKJ joint venture was at the center of the inquiry and affirmed that external counsel had been appointed to investigate the allegations concerning KBR. KBR's external counsel, Baker Botts, which had been hired to investigate KBR's actions in Nigeria at least as early as 2003, after the French investigation began, effectively served as the DOJ's "outsourced" investigatory arm in the initial stages. Upon information and belief, Baker Botts interviewed numerous KBR executives, including sales executives, Nigeria project executives, senior management executives, and Stanley himself. Upon further information and belief, Baker Botts submitted documents and reports to the DOJ concerning its investigation of KBR. Halliburton's 2004 10-K confirmed that the DOJ and the SEC

---

[23] *Id*.

[24] *Id*.; Russell Gold and Charles Fleming, OUT OF AFRICA: IN HALLIBURTON NIGERIA PROBE, A SEARCH FOR BRIBES TO A DICTATOR, Wall Street Journal, Sept. 29, 2004.

[25] Isikoff & Hosenball, *supra* note 21; Russell Gold and Charles Fleming, FRENCH LOOK AT ACCOUNT TIED TO KBR, Wall Street Journal, June 2, 2004; David Ireland, THE CHENEY CONNECTION, LA Weekly, June 17, 2004.

[26] 2003 Halliburton 10-K, available at
https://www.sec.gov/Archives/edgar/data/45012/000004501204000086/ed10k2003.txt.

had launched formal investigations, and it also disclosed that documents had been produced to the government and employees made available for interview.[27]

43.    KBR came to understand that the DOJ intended to strike a significant blow to punish its and Stanley's conduct in Nigeria, which was ultimately reflected in the plea agreement KBR signed in 2009 that imposed a fine of $402 million and a three-year organizational probationary period during which an independent monitor was installed to investigate and report on KBR's internal controls, financial reporting, and policies and procedures concerning FCPA and anti-corruption compliance.[28]

44.    Ultimately, the DOJ's investigation led to criminal proceedings against Stanley, Tesler (who had been TKSJ's agent for transmitting bribes to Nigerian officials), Wojciech Chodan (who had been a KBR sales VP and later a consultant that also assisted in arranging the bribes to Nigerian officials), KBR, Technip, and JGC. The SEC also brought proceedings against Stanley, Halliburton, KBR, Technip, and Snamprogetti. Stanley, Tesler, and Chodan each pleaded guilty to serious federal crimes, and Stanley also entered into a settlement agreement with the SEC. KBR entered into a plea agreement with the DOJ and a settlement agreement with the SEC. Halliburton entered into a settlement agreement with the SEC. Technip entered into a deferred prosecution agreement with the DOJ and a settlement agreement with the SEC. JGC entered into a deferred prosecution agreement with the DOJ. Snamprogetti entered into a settlement agreement with the SEC. These criminal and civil actions revealed that at the center of this chaos and wrongdoing was

---

[27] 2004 Halliburton 10-K, available at
https://www.sec.gov/Archives/edgar/data/45012/000004501205000055/ed10k2004_final.htm; *see also*, Russell Gold, SEC OPENS PROBE OF KBR PAYMENTS FOR NIGERIA PLANT, Wall Street Journal, June 14, 2004.

[28] *U.S. v. Kellogg Brown and Root LLC*, Case No. 4:09-cr-00071 (S.D. Tex.) (ECF No. 12, ¶ 18).

KBR and Stanley, who had during his tenure acted with reckless avarice by engaging in schemes with foreign agents to bribe foreign officials and enrich himself.

45.    The investigations underlying those proceedings also revealed that Stanley, while a senior officer of KBR, had used his position of influence and power to take a share of the rightfully earned commissions that KBR paid for Mr. Khoury's exceptional work.

**B.  KBR's CEO Extorts Mr. Khoury**

46.    Stanley demanded a share of the already-discounted commissions that KBR paid on some of the LNG projects that Mr. Khoury helped KBR win. If Stanley did not receive what he was asking, he was in a position to abusively deny due remuneration to Mr. Khoury on numerous developing LNG contracts and black-list Mr. Khoury from working in the EPC/LNG industry altogether. This was not an idle threat. Stanley's role as a top executive of KBR, one of the leading global EPC firms in the small and specialized community of LNG contractors, positioned him at the pinnacle of the industry and gave him great influence over the future of Mr. Khoury's career. Ill words from Stanley would have doomed Mr. Khoury's continued efforts to build his consultancy practice. Mr. Khoury was at Stanley's mercy and thus prevailed upon the consulting companies to transfer portions of the success-based commissions he had earned to Stanley, amounting to $10.8 million.

47.    Stanley's influence waned after his retirement as KBR's CEO in 2001, diminishing the threat to Mr. Khoury's career. KBR entered into new agreements, some of which promised to finally pay higher, market-rate commissions to Mr. Khoury for his work.

48.    Mr. Khoury thought he had finally escaped Stanley's damaging grasp, but another punishment was in store for him when the DOJ unsealed Stanley's criminal information and filed his plea agreement on September 3, 2008. Although those pleadings focused chiefly on Stanley's

wide-ranging involvement with the bribery of Nigerian officials, the criminal information and plea also tacked on a "kickback" claim implicating Mr. Khoury in a conspiracy with Stanley. According to that claim, Stanley purportedly steered big projects to Mr. Khoury's consulting companies with the understanding that Mr. Khoury would pay Stanley a "kickback" for the favor of steering him unearned business. These same allegations were repeated and expanded upon in the indictment that the DOJ filed under seal against Mr. Khoury on November 24, 2008. There, the DOJ asserted that Stanley and Mr. Khoury had joined a conspiracy with the purpose of unjustly enriching themselves at KBR's expense.[29]  Thus, the notion that Mr. Khoury's services did not merit the amounts KBR paid was foundational to the DOJ's claims against him.

49.     It also became apparent that KBR had betrayed the loyalty and service that Mr. Khoury had shown over the course of more than 25 years. When KBR learned about the payments to Stanley, diligence dictated that its external counsel investigate for signs of improper "steering" by Stanley, or for signs of other forms of unduly favorable treatment by Stanley for Mr. Khoury's benefit, or for any indication that would corroborate a theory of a conspiracy between Stanley and Mr. Khoury to misappropriate KBR's money. That investigation could yield no such evidence; to the contrary, there was ample evidence that KBR had benefited greatly from Mr. Khoury's work. KBR knew that the facts underlying Stanley's plea to a "conspiracy" with Mr. Khoury, and the DOJ's later charges against Mr. Khoury, were incompatible with reality because the prosecution theory was that Mr. Khoury's work for KBR did not merit the commissions that KBR paid. Contrary to the notion that the commissions were unearned, they were a bargain for KBR. KBR knew this but nonetheless helped manufacture and support a bogus narrative that Mr. Khoury

---

[29] *U.S. v. Khoury*, Case No. 4:08-cr-00763 (S.D. Tex.) ("*Khoury*") (ECF No. 1, ¶ 9).

was a crook in league with Stanley. Doing so would minimize KBR's own criminal exposure for Stanley's acts and maximize its perceived "cooperation" with the DOJ.

### C. KBR Scapegoats Mr. Khoury

50.     When Stanley's misdeeds came to light, KBR did not seek to rectify the wrongs its top executive had visited on Mr. Khoury by artificially depressing the commissions and then demanding a share of them. As it stood, KBR faced steep liability for Stanley's conduct vis-à-vis the Nigerian bribery scandal. A thoroughgoing investigation into other instances of Stanley's wrongdoing as a corporate executive and officer risked exposing broader institutional rot and inviting further government scrutiny and possible civil suits. KBR drew a circle around anyone associated with Stanley and quarantined them to preserve itself.

51.     Having mounted its own internal investigation beginning at least as early as 2003 that allowed it to get ahead of the DOJ's investigation and steer its direction, KBR served up Mr. Khoury to the DOJ as a scapegoat, lumping him together with Stanley as a couple of bad actors. KBR severed its relationship with Stanley in June 2004[30] and shortly thereafter severed its relationship with Mr. Khoury, owing commissions for LNG projects in Yemen and Indonesia valued at over $3 billion, which Mr. Khoury had helped KBR secure. KBR cast itself as the "victim" of a criminal conspiracy between Stanley and Mr. Khoury and maliciously impugned Mr. Khoury alongside Stanley, saving itself tens of millions of dollars of outstanding commissions in the process and ensuring that the $10.8 million that Stanley strong-armed Mr. Khoury to obtain would go to KBR as "restitution" under the terms of Stanley's plea and sentence.

---

[30] Simon Romero, HALLIBURTON SEVERS LINK WITH 2 OVER NIGERIA INQUIRY, New York Times, June 19, 2004 (referring to termination of Stanley and Chodan).

52.     Upon information and belief, KBR both directly and through its outside counsel provided the fuel for the DOJ's claims concerning Mr. Khoury, which led first to the highly publicized criminal information and plea agreement the DOJ filed against Stanley on September 3, 2008,[31] in which the DOJ all but identified Mr. Khoury by name, and then to the indictment it filed under seal on November 24, 2008, in which it spelled out its charges against Mr. Khoury.[32] The allegations therein lead ineluctably to the conclusion that KBR maliciously caused the DOJ to believe (incorrectly) that:

     (i)     Mr. Khoury's work did not merit the commissions that KBR had paid;

     (ii)     the commissions were awarded and paid at Stanley's discretion;

     (iii)     Stanley steered projects to Mr. Khoury's consulting companies so that the two men could clandestinely share the unearned commissions; and

     (iv)     the commission amounts were beyond what would have or should have otherwise been paid so that Stanley could plunder the excess.

53.     In truth and in fact, KBR knew that:

     (i)     Mr. Khoury was instrumental in helping KBR win numerous, highly remunerative contracts;

     (ii)     Mr. Khoury was highly respected both within KBR and throughout the EPC/LNG industry for the knowledge, expertise, and relationships of trust he had curated over many years;

---

[31] *Stanley*, *supra* note 2 (ECF Nos. 1, 9); *see also* T. Christian Miller, *U.S. Targets Overseas Bribery; KBR Exec's Plea Widens Probe*, ProPublica (Sept. 9, 2008), available at https://www.propublica.org/article/kbr-exec-plea-widens-probe-909.

[32] *Khoury*, *supra* note 29 (ECF No. 1).

(iii)    the LNG project commissions were below market rate and were approved by multiple KBR executives;

(iv)    Stanley did not possess sole discretion to award the contracts or steer them towards Mr. Khoury. Rather, various executives within KBR's management (other than Stanley) approved the agreements;

(v)    contrary to the implication that Stanley steered projects to Mr. Khoury so that they could share fees in a "kickback" scheme, it was Mr. Khoury who proposed the projects to KBR per the terms of the general consultancy agreements. If KBR, after review and analysis, determined that it was interested in a project that Mr. Khoury proposed, it would work together with Mr. Khoury to develop the project, leading to negotiations of formal supplementary agreements for commission; and

(vi)    commissions generally were approved and paid only after Mr. Khoury had rendered the services that led to KBR being awarded the contracts for the projects, further undermining the theory of a predetermined fraud to steal money from KBR.

54.    If the commissions KBR agreed to pay were simply the fraudulent byproduct of secret deals between Mr. Khoury and Stanley, then Mr. Khoury would have faded away when Stanley stepped down as CEO. That is not what happened. KBR knew that not only did Mr. Khoury's relationship with KBR survive Stanley's retirement as CEO in 2001, but also that the commission levels and other contract terms of the consulting relationship improved for Mr. Khoury with Stanley out of the picture. KBR renewed the relationship with a five-year General Consulting Agreement in 2003 that paid a monthly retainer of $8,000, and which specified a minimum default rate of 0.5% success-based commission on LSTK EPC contracts, and a default rate of 1% on other contracts. At that time, KBR noted internally that "[c]onsultant success fees for this type of

project[] and for this defined territory is rarely less than 1 percent. This [minimum default] rate is discounted [0.5%] to reflect ongoing nature of the relationship as opposed to a one-time single project deal." These rates served as an absolute default floor, and the rates would otherwise be determined on a project-by-project basis. After Stanley's tenure, KBR signed two additional project-specific fee agreements with Mr. Khoury's consulting firm, in which it committed to pay commissions that, at rates of 2-5%, more than doubled the rates in the agreements that were signed during Stanley's tenure at KBR.[33]

55.     KBR also knew that the commission agreements were mandatory supplements for Mr. Khoury's successful project proposals under the terms of the pre-existing general consultancy agreements, many of which were approved, executed, and supervised by KBR executives other than Stanley. Under the general consultancy agreements, Mr. Khoury was retained to identify and develop EPC opportunities (including LNG projects) for KBR in geographic areas and markets agreed to by the parties.[34] Mr. Vaughn, the president of Kellogg who had roundly praised Mr. Khoury for his efforts on the Iraq fertilizer project in the mid-1980s (and who was Stanley's superior at the time), awarded the early agreements. Under those agreements, Mr. Khoury was to report to a Kellogg executive other than Stanley. Mr. Vaughn awarded and signed additional general consultancy agreements with Mr. Khoury in 1990 and 1991. Over a fifteen-year period between 1988 and 2003, ten (10) such agreements were signed, and the majority were approved and executed by KBR executives other than Stanley.

---

[33] A June 20, 2003 agreement for Consulting Services for Miscellaneous Projects in Iraq provided a 2% commission to Gulfbridge for EPC contracts entered into by KBR on a lump sum turnkey basis and a 3% commission to Gulfbridge for EPC contracts entered into by KBR on a basis other than LSTK. A December 3, 2003 agreement for Kuwait EQUATE Olefins provided a 3% commission to Gulfbridge where KBR technology was not selected prior to bidding and a 5% commission where KBR technology was selected prior to bidding.

[34] *See, e.g.*, July 15, 1988, Letter from Donald C. Vaughn to Mayfair, c/o Samir Khoury.

56.    KBR's esteem for Mr. Khoury was unhesitating: in approving one of the consulting agreements, KBR stated that it "serves as [Mr. Khoury's] reference. KBR needs no third-party reference, although [Mr. Khoury] does enjoy [an] excellent reputation verified with the following entities: Chiyoda Corporation, JGC Corporation, Heurtey Petrochem France, Mannai Corporation Qatar, Ministry of Oil and Gas Oman."[35]

57.    KBR knew that Mr. Khoury had a sterling reputation from having helped KBR win a series of highly lucrative contracts; his work was known and valued by executives throughout the organization; the terms of the consulting agreements were understood and approved by many top executives and blessed by the legal division; the supplemental agreements to pay commissions on awarded projects were part-and-parcel of the general consultancy agreements; and the amounts of the commissions KBR agreed to pay were a matter of open knowledge within the organization – amounts that KBR considered to be well within reason. Contrary to the DOJ and KBR's later assertion that KBR was a "victim" of Mr. Khoury's theft and criminal conspiracy to unjustly enrich himself, Mr. Khoury enhanced KBR's money and property by identifying and procuring lucrative LNG contracts for the company in exchange for below-market fees.

58.    Considering the above facts, the DOJ could not have settled on its prosecution theory that Mr. Khoury colluded with Stanley in a covert scheme to misappropriate KBR's funds to line his and Stanley's pockets with funds that Mr. Khoury had not earned without KBR guiding it to such a conclusion through material misrepresentations and omissions concerning Mr. Khoury.

**D.  Criminal Proceedings Against Mr. Khoury**

59.    After Stanley's plea hearing on September 3, 2008, Mr. Khoury was concerned that the government would bring charges against him because in that hearing, the DOJ specifically

---

[35] KBR Agency Approval Request form for Gulfbridge, dated May 15, 2003, at ¶ 18.

mentioned the "dual U.S. and foreign national" referred to as the LNG Consultant when discussing

other "potential defendants."[36] Publicly accused, Mr. Khoury's career and reputation suffered a

fatal blow. That plea and criminal information described a dual national Lebanese-American "LNG

Consultant" who was a salesperson and then later a consultant for Kellogg in the Middle East,

going on to describe the locations of the "LNG Consultant's" projects in Malaysia, Egypt, and

Yemen.[37] This marked out Mr. Khoury and immediately blackened his name in the LNG industry.

Mr. Trostel, the former Kellogg/KBR executive, testified that it became widely known throughout

the LNG industry that the DOJ had accused Mr. Khoury of conspiring with Stanley.[38] Likewise,

Mr. Gerro recalled that "everybody was able to find it on the internet so it became widely known

throughout all the circles."[39] At this point, Mr. Khoury lost the ability to practice his livelihood. In

Mr. Gerro's words:

> There is no company in the world that would talk to Mr. Khoury, based on the
> [Stanley Criminal Information], because he lost his reputation. Everybody that
> reads that document and they know that this is Samir Khoury, they will not be able
> to touch him with anything.[40]

60.     Mr. Khoury became aware of how quickly the news of his pending charges spread.

Immediately following Stanley's plea proceedings in 2008, numerous clients and colleagues of

Mr. Khoury in the EPC/LNG industry contacted him and asked about the DOJ allegation that he

had paid kickbacks to Stanley. Over the subsequent years, Mr. Khoury continued to receive

inquiries from former clients and colleagues in the EPC/LNG industry regarding whether he had

been indicted or otherwise charged by the DOJ. Adding to Mr. Khoury's woe, he was contacted on

---

[36] *Stanley*, *supra* note 2 (ECF No. 25 at 15).

[37] *Id.* (ECF No. 1 at 15-18).

[38] Trostel Dep., at 74.

[39] Gerro Dep., at 63.

[40] *Id*. at 64.

multiple occasions by news media, which had also identified him as the "LNG Consultant" in Stanley's plea. Mr. Khoury was unable to obtain further consulting work in the EPC/LNG industry, which was a direct result of the investigation and indictment that KBR had baselessly procured against Mr. Khoury. His clients declined to continue their consulting relationship with him and the companies with which he was affiliated, costing Mr. Khoury his livelihood.

61.     Moreover, Mr. Khoury was precluded even from traveling. Having returned to Lebanon to care for his elderly parents in 2004, Mr. Khoury was effectively imprisoned there, lest he be detained in some country in Europe or the Middle East through which he was transiting because of the publicity that he was the (falsely) accused "LNG Consultant." At least as early as 2009, the DOJ caused an Interpol diffusion notice to be sent, which was again renewed in March 2015, and which was followed by an Interpol red notice in January 2019, at which time the Lebanese government seized Mr. Khoury's passports and ordered him not to travel. During this time, however, Mr. Khoury was not properly designated as a fugitive under U.S. law. As this court would later determine, because the DOJ sealed its 2008 indictment of Mr. Khoury and (as detailed below) affirmatively opposed his efforts to learn if he had been charged, Mr. Khoury was not a fugitive from justice.[41] It was only in early 2025, after his indictment was finally dismissed, that Mr. Khoury was able to apply for and obtain new passports, and to travel outside of Lebanon for the first time in over fifteen years.

62.     Mr. Khoury also experienced difficulties in conducting banking and other business activities in Lebanon and elsewhere because of the accusations and the resultant media interest. Specifically, Mr. Khoury was denied the right to open new bank accounts in Lebanon. These

---

[41] *Khoury v. U.S.*, Case No. 4:17-mc-02553 (S.D. Tex.) ("*Khoury IV*") (ECF No. 22, at p.6).

limitations were imposed by Lebanese government authorities solely because Interpol had formally notified them that Mr. Khoury was the subject of a criminal investigation in the U.S.

63.     Mr. Khoury was resolved as to his innocence, but he could not have anticipated how long it would take to clear his name. Mr. Khoury sought multiple times to protect his rights and to determine whether an indictment had been filed naming him and, if so, to have it unsealed and dismissed.[42] In 2014, he filed a motion to unseal and dismiss the indictment (assuming its existence), which was unsuccessful.[43] In 2015, he filed a complaint for violation of due process, contending that the DOJ had improvidently identified him in the Stanley plea agreement but that attempt, too, was unsuccessful.[44] In 2017, Mr. Khoury again moved to have the indictment unsealed and dismissed.[45] Finally, after years of litigation with the DOJ, the indictment, which had been filed on November 24, 2008, was ordered unsealed on July 9, 2018.[46] Mr. Khoury sought unsuccessfully to dismiss the indictment on speedy-trial and statute-of-limitations grounds, litigating his case to the U.S. Fifth Circuit Court of Appeal and to the U.S. Supreme Court. The DOJ finally moved to dismiss its indictment against Mr. Khoury in 2024, and the court entered an order dismissing the charges with prejudice on November 20, 2024.[47]

64.     Mr. Khoury's odyssey saw his reputation savaged and his livelihood ruined. He lost over fifteen years of his life fighting unjust charges because KBR, chastened by Stanley's misdeeds, offered up Mr. Khoury to the DOJ, so KBR could save itself the tens of millions of

---

[42] *See Khoury v. U.S.*, Case No. 4:14-mc-02884 (S.D. Tex.) ("*Khoury II*"); *Doe v. U.S.*, Case No. 4:15-cv-02414 (S.D. Tex.) ("*Khoury III*"); *Khoury IV*, *supra* note 41.

[43] *Khoury II*, *supra* note 42 (ECF Nos. 1, 16).

[44] *Khoury III*, *supra* note 42 (ECF Nos. 1, 27).

[45] *Khoury IV*, *supra* note 41 (ECF No. 1).

[46] *Id.* (ECF No. 25).

[47] *Khoury*, *supra* note 29 (ECF No. 71).

dollars it owed in commissions and deflect attention from its own failure to rein in Stanley. This resulted in Mr. Khoury's criminal prosecution despite his innocence.

65. KBR procured the DOJ's prosecution of Mr. Khoury, despite knowing: (i) Stanley did not have the ability in his sole discretion to cause the award of contracts to Mr. Khoury; (ii) the consulting fees and commissions that Kellogg/KBR agreed to pay were at or below market, not inflated fees and commissions; (iii) the commissions were due in exchange for services already performed for Kellogg/KBR's benefit (not for anything done by or for Stanley personally); (iv) Kellogg/KBR received all of the value it paid for in commissions; and (v) the commissions were not set until the work of identifying and procuring the LNG opportunities that the commissions reflected was complete.

66. The theory of the DOJ's case, which KBR helped author, collapsed under scrutiny and was justly, if belatedly, dismissed – but not before it irreparably harmed Mr. Khoury.

## FIRST CAUSE OF ACTION – MALICIOUS PROSECUTION

67. Plaintiff incorporates the allegations of paragraphs 1 – 66 as if fully set forth herein.

68. Upon information and belief, KBR initiated and procured a criminal proceeding against Mr. Khoury, including by making materially false representations and misleading omissions concerning commissions it agreed to pay for work that Mr. Khoury performed. Upon information and belief, KBR affirmatively and/or by deliberate omission led the DOJ to believe that Mr. Khoury and Stanley entered into a secret agreement to steer large, unearned commissions to Mr. Khoury's consulting companies so that Stanley could receive kickbacks from those amounts. As a result, the DOJ brought criminal charges against Mr. Khoury based on the theory that Mr. Khoury was unjustly enriched *at KBR's expense* through outlandish and unearned commissions arising from clandestine agreements he made with Stanley.

69.    KBR knew that the facts did not support that narrative: the commissions were earned because KBR was awarded highly lucrative LNG projects because of Mr. Khoury's work; the commissions were modest in comparison to the market rates; and the commissions were known and approved throughout KBR. Despite the facts, KBR encouraged and supported the "kickback" narrative, standing shoulder-to-shoulder with the DOJ as it claimed KBR, not Mr. Khoury, was a "victim"[48] of Stanley's scheme to plunder the commissions and requested that the money that Stanley took from Mr. Khoury be paid to KBR as "restitution."[49]

70.    The prosecution was terminated in Mr. Khoury's favor when the court granted the DOJ's motion to dismiss the indictment with prejudice on November 20, 2024.[50] Mr. Khoury was innocent of the charges, not least because the facts show that Mr. Khoury had not been unjustly enriched nor had there ever been a scheme for Stanley to steer consulting fees to Mr. Khoury's consulting companies in return for kickbacks. Nor did the facts support a probable cause basis for initiating a prosecution against Mr. Khoury.

71.    As shown herein, KBR demonstrated malice in targeting Mr. Khoury for the DOJ's prosecution, including through material misrepresentations and omissions concerning the true history, nature, and purpose of the commissions it had agreed to pay Mr. Khoury's consulting companies. KBR's malice is underscored by the fact that it used the DOJ's investigation of Mr. Khoury to terminate the extant general consultancy agreement with Gulfbridge and to withhold $20 million in outstanding commissions it had agreed to pay for two large, profitable LNG projects that Mr. Khoury helped KBR procure. Finally, KBR's malice is shown through its insistence that it was a "victim" of Stanley and Mr. Khoury's alleged criminal conspiracy. Through that insistence,

---

[48] *Stanley*, *supra* note 2 (ECF No. 46 at 2).

[49] *Id.* at 43.

[50] *Khoury*, *supra* note 29 (ECF Nos. 69, 71).

KBR garnered a restitution payment of $10.8 million from Stanley that in fact represented money that Stanley had extorted from fees that Mr. Khoury had rightfully earned.

72.     The events surrounding Mr. Khoury's indictment described herein effectively ruined Mr. Khoury's career and caused him anguish, humiliation, and loss of reputation, in addition to having incurred legal fees to defend against a false criminal indictment and theory. In the absence of KBR's conduct in promoting Mr. Khoury's prosecution, the outstanding commissions would have been paid, the restitution of the money that Stanley took would have rightfully gone to Mr. Khoury (instead of KBR), Mr. Khoury would have avoided the legal fees he incurred in defending himself against criminal prosecution, and, most importantly, Mr. Khoury would have been able to continue to earn his livelihood and enjoy the fruits of the career he had spent decades assiduously building as an architect of highly ambitious joint-venture LSTK LNG projects.

73.     The damage that flows from KBR's conduct is apparent. Both Mr. Trostel and Mr. Gerro testified that it was widely recognized throughout the LNG industry from 2008 onwards that the DOJ had accused Mr. Khoury of being Stanley's co-conspirator, rendering it impossible for Mr. Khoury to continue working in the LNG industry.[51]

74.     Mr. Khoury has suffered significant damages as a proximate result of KBR's conduct. Compensatory damages include, at a minimum, the sums of: (i) $10.8 million, representing the amounts that KBR's CEO Stanley extorted and which KBR received as restitution from the DOJ's action against Stanley by representing that it was a "victim" of Mr. Khoury's attempt to unjustly enrich himself; (ii) no less than $8.102 million, representing the defense costs Mr. Khoury incurred as a result of KBR maliciously procuring his prosecution by the DOJ; and

---

[51] Trostel Dep., at 74; Gerro Dep., at 63-64.

(iii) no less than $1 million to compensate Mr. Khoury for his mental anguish, loss of reputation, and loss of liberty he has endured for over fifteen years.

75.     Mr. Khoury is also entitled to special damages for the loss of income he suffered from the destruction of his reputation and his inability to work. Mr. Khoury (and his recognized expertise) was the raison d'être for the agreements that Kellogg/KBR signed with Mayfair, GCA, and Gulfbridge. With Mr. Khoury encumbered by the DOJ's false charges, those entities lost their driving force and unsurprisingly ceased to function with Mr. Khoury unable to work. Mr. Khoury's work earned regular monthly retainers and secured large commissions on successful projects. From 1988 till 2004, Mr. Khoury's efforts earned a total of at least $36.229 million.  Left unpaid for that same period were agreed and documented fees of $10 million for the Yemen LNG Contract award, $10 million for the Tangguh LNG Contract award, and a $400,000 unpaid installment on the JUPC Ethylene Contract awarded and executed by KBR in Saudi Arabia, totaling $20.4 million.  In total, those paid and unpaid earnings from 1988 to 2004 from Kellogg/KBR amounted to $56.629 million. During the lost period of nearly twenty prime years of Mr. Khoury's working life, while he was precluded from earning his living because of KBR's procurement of his criminal prosecution, Mr. Khoury could have earned an amount at least equivalent to that earned during the 1988 to 2004 period. Given that Mr. Khoury had reached the prime of his career in 2004, was no longer under Stanley oppressive thumb, and had just signed commission agreements that ranged from 2-5%, it is likely that Mr. Khoury's earnings in the last twenty years would have significantly exceeded the amounts he earned from 1988-2004, had he not been falsely implicated by KBR in Stanley's wrongdoing.

76.     As described above, the damages that arise from Mr. Khoury's claims amount to at least $76.531 million. In addition, Mr. Khoury seeks exemplary damages due to KBR's wanton and malicious actions.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Khoury prays that this Court grant:

(a) An award of compensatory damages to Mr. Khoury in an amount to be determined of not less than $76.531 million;

(b) An award of exemplary damages to Mr. Khoury in an amount to be determined;

(c) Awards of pre- and post-judgment interest; and

(d) Any other such relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 19, 2025                              Respectfully submitted,


FISHMAN HAYGOOD, L.L.P.

*/s/ Benjamin D. Reichard*
Benjamin D. Reichard
Texas Bar No. 24098693
breichard@fishmanhaygood.com
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Tel.: (504) 586-5252
Fax: (504) 586-5250

And

**KHALIL LAW PLLC**

*/s/ Samy Khalil*_____
Samy Khalil
Texas Bar No. 24038997
samy@khalil.law
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
Tel: (713) 904-4477
Fax: (713) 565-9915

*Counsel for Plaintiff Samir R. Khoury*