**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

------------------------------------------------------------------- x

SAMIR R. KHOURY*,*

                Plaintiff,

          -against-

KBR, Inc.,

            Defendant.

: Case No. 4:25-CV-05570
:
:
:
:
:
:
:
:
:
:
:
: JURY TRIAL DEMANDED
:
:
:

------------------------------------------------------------------- x

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT KBR, INC.'S MOTION TO DISMISS**

Dated: March 26, 2026

**FISHMAN HAYGOOD, L.L.P.**

Benjamin D. Reichard
Attorney-In-Charge
Texas Bar No. 24098693
breichard@fishmanhaygood.com
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Tel: (504) 586-5252
Fax: (504) 586-5250

and

**KHALIL LAW PLLC**

Samy Khalil
Texas Bar No. 24038997
samy@khalil.law
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
Tel: (713) 904-4477
Fax: (713) 565-9915

*Counsel for Plaintiff Samir R. Khoury*

**TABLE OF CONTENTS**

*Page*

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.................. 1

II.   LEGAL STANDARD............................................................................................ 1

III.  STATEMENT OF THE ISSUES ........................................................................ 2

IV.  SUMMARY OF THE ARGUMENT.................................................................. 3

V.   STATEMENT OF FACTS ................................................................................. 3

VI.  ARGUMENT ....................................................................................................... 6

A.    The Complaint Establishes that KBR Procured Prosecution by Knowingly Supplying False Information. .............................................................................. 6

B.    The Complaint Establishes Innocence. .......................................................... 9

C.    The Complaint Establishes the Absence of Probable Cause....................... 12

D.    The Complaint Establishes Malice. .............................................................. 15

E.    The Complaint Establishes Damages. .......................................................... 17

F.    KBR's Pleading and Policy Objections Fail. ............................................... 19

VII. CONCLUSION.................................................................................................. 20

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ada Oil Co. v. Dillaberry*,
440 S.W.2d 902 (Tex. App.—Houston [14th Dist.] Apr. 9, 1969, writ dism'd w.o.j.) ........... 18

*Akin v. Dahl*,
661 S.W.2d 917 (Tex. 1983) ................................................................................... 2, 12, 14

*Alamo Country Club Owners Ass'n v. Shelton*,
2012 WL 3792753 (Tex. App.—Corpus Christi Aug. 31, 2012, no pet.) .............................. 16

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .................................................................................................. 2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................ 1

*Bailey v. State*,
531 S.W.2d 628 (Tex. Crim. App. 1976) .............................................................................. 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................ 2

*Browning-Ferris Indus., Inc. v. Lieck*,
881 S.W.2d 288 (Tex. 1994) ...........................................................................................Passim

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) ............................................................................................... 8, 13

*Compton v. Calabria*,
811 S.W.2d 945 (Tex. App.—Dallas May 13, 1991, no pet.) ................................................ 18

*Connolly v. Deutsche Bank AG*,
No. 22-CV-9811 (JMF), 2023 WL 7168314 (S.D.N.Y. Oct. 31, 2023) ................................ 12

*Digby v. Tex. Bank*,
943 S.W.2d 914 (Tex. App.—El Paso Mar. 6, 1997, writ denied) ........................................ 16

*Ex parte Plumb*,
595 S.W.2d 544 (Tex. Crim. App. 1980) .............................................................................. 13

*French v. French*,
385 S.W.3d 61 (Tex. App.—Waco Jul. 29, 2012, pet. denied) ............................................. 15

*Gonzalez v. Grimm*,
479 S.W.3d 929 (Tex. App.—El Paso Jul. 8, 2015, no pet.) ................................................... 8

*Guernsey Community Federal Credit Union v. Gonzalez*,
539 S.W.2d 896 (Tex. App.—El Paso 1976, writ ref'd n.r.e.) .............................................. 16

*Hernandez v. Mendoza*,
406 S.W.3d 351 (Tex. App.—El Paso Jul. 3, 2013, no pet.) .................................................. 16

*Hill v. Blue*,
No. 01-20-00418-CV, 2022 WL 3031603 (Tex. App.—Houston [1st Dist.] Aug. 2, 2022, no pet.)
................................................................................................................................... 2, 7, 9

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
892 F.3d 719 (5th Cir. 2018) ............................................................................................ 2, 19

*King v. Graham*,
   126 S.W.3d 75 (Tex. 2003) .................................................................................. 2, 7
*Kroger Tex. Ltd. P'ship v. Suberu*,
   216 S.W.3d 788 (Tex. 2006) ........................................................................ 2, 14, 20
*Luce v. Interstate Adjusters, Inc.*,
   26 S.W.3d 561 (Tex. App.—Dallas Sept. 8, 2000, no pet.) ..................................... 16
*McShirley v. Lucas*,
   No. 02-23-00229-CV, 2024 WL 976512 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied)
   ........................................................................................................................ 14, 18
*Metzger v. Sebek*,
   892 S.W.2d 20 (Tex. App.—Houston [1st Dist.] Sept. 19, 1994, writ denied) ...................... 12
*Quantlab Techs. Ltd. (BGI) v. Godlevsky*,
   No. H-9-4039, 2012 WL 2577548 (S.D. Tex. July 3, 2012) .................................... 10
*Richey v. Brookshire Grocery Co.*,
   952 S.W.2d 515 (Tex. 1997) ......................................................................... Passim
*S. Texas Freightliner, Inc. v. Muniz*,
   288 S.W.3d 123 (Tex. App.—Corpus Christi Mar. 12, 2009, no pet.) .................................. 13
*Smith v. Wal-Mart Stores, Inc.*
   2019 WL 5457798 (S.D. Tex. Oct. 24, 2019) ............................................................ 8
*Sutton v. United States*,
   No. 99-20694, 2000 WL 1568222 (5th Cir. Sept. 19, 2000) .................................... 10
*Thrift v. Hubbard*,
   974 S.W.2d 70 (Tex. App.—San Antonio 1998, pet. denied) ................................. 3, 15, 17, 18
*Tranum v. Broadway*,
   283 S.W.3d 403 (Tex. App.—Waco Jul. 2, 2008, no pet.) .................................... 9, 16
*Turner v. Roadway Exp., Inc.*,
   911 S.W.2d 224 (Tex. App.—Fort Worth Nov. 9, 1995, pet. denied) ..................................... 8
*United States v. Khoury*,
   No. 4:08-cr-00763, 2019 WL 6687715 (S.D. Tex. Dec. 6, 2019) ......................................... 11
*United States v. Khoury*,
   No. 4:17-MC-2553, 2018 WL 2864413 (S.D. Tex. June 11, 2018) ...................................... 11
*United States v. Stein*,
   541 F.3d 130 (2d Cir. 2008) ........................................................................................ 17
*USA Lending Grp., Inc. v. Winstead PC*,
   669 S.W.3d 195 (Tex. 2023) ....................................................................................... 18
*Zess v. Funke*,
   956 S.W.2d 92 (Tex. App.—San Antonio 1997, no pet.) .................................... 3, 18

iv

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case concerns a malicious-prosecution claim arising from Defendant KBR, Inc.'s ("KBR") hand in procuring a criminal case against Plaintiff Samir R. Khoury ("Khoury"). By feeding the United States Department of Justice ("DOJ") falsehoods and withholding the facts that would have punctured its theory, KBR caused DOJ to indict Khoury in 2008. R. Doc. 1, Complaint, Nov. 19, 2025 ("Compl.") ¶¶ 42, 49, 52, 58–59. That case ended in dismissal with prejudice in 2024. Compl. ¶¶ 10, 63, 66.

DOJ's prosecution rested on a theory that worked only if (1) the commissions KBR paid for Khoury's consulting services over fifteen years were unearned and procured because (2) KBR's CEO, Albert 'Jack' Stanley ("Stanley"), secretly steered contracts to Khoury in exchange for kickbacks rather than for Khoury's legitimate, valuable work. But the Complaint alleges KBR knew the opposite: Khoury generated billions in value, received *below*-market commissions approved by multiple executives after the services were performed, and dealt with a company in which Stanley lacked unilateral power to award the agreements or conjure the supposed quid pro quo. DOJ thus adopted a fraud theory KBR could keep alive only by supplying false information and omitting the facts that killed it. It was also a theory that benefited KBR and harmed Khoury, as KBR used the prosecution to claim criminal restitution of $10.8 million that was Khoury's rightful earnings and to avoid paying another $20 million it owed for Khoury's consulting work.

This case is at the pleading stage. KBR moves for dismissal under Rule 12(b)(6). R. Doc. 17, KBR's Motion to Dismiss, Mar. 5, 2026 ("Mot."). The Court should deny the motion.

## II.   LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court accepts well-pleaded facts as true and asks only whether the Complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

(2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Pleading on information and belief is proper "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

### III.   STATEMENT OF THE ISSUES

1.      Whether the Complaint plausibly alleges that KBR procured the prosecution by knowingly supplying false information on which DOJ acted in commencing the case. *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292–93 (Tex. 1994); *King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003) (per curiam); *Hill v. Blue*, No. 01-20-00418-CV, 2022 WL 3031603, at *9 (Tex. App.—Houston [1st Dist.] Aug. 2, 2022, no pet.); Compl. ¶¶ 42, 52, 58.

2.      Whether the Complaint plausibly alleges actual innocence and lack of probable cause by pleading that Khoury's commissions were earned, below market, approved by multiple executives after services were rendered, that KBR retained unilateral bid control, and that Stanley, KBR's former CEO and convicted felon, extorted the payments. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517–19 (Tex. 1997); *Akin v. Dahl*, 661 S.W.2d 917, 920–21 (Tex. 1983); Compl. ¶¶ 7-8, 28, 32-33, 46, 53-57, 65.

3.      Whether the Complaint plausibly alleges malice by pleading that KBR sought $10.8 million in restitution, cooperation credit,[1] and relief from more than $20 million in commissions by presenting itself as a financial victim and Khoury as Stanley's confederate. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792–94 (Tex. 2006); *Richey*, 952 S.W.2d at 519; Compl. ¶¶ 11, 50-51, 64, 71, 75.

---

[1] KBR itself pleaded guilty in 2009 to Foreign Corrupt Practices Act ("FCPA") violations, drawing a $402 million fine and a three-year organizational probationary period. Compl. ¶ 43.

4.       Whether the Complaint plausibly alleges prosecution-caused damages, including Interpol notices, travel and banking restrictions, defense costs, and lost earning capacity. *Thrift v. Hubbard*, 974 S.W.2d 70, 77 (Tex. App.—San Antonio 1998, pet. denied); *Zess v. Funke*, 956 S.W.2d 92, 93 (Tex. App.—San Antonio 1997, no pet.); Compl. ¶¶ 60-63, 74-76.

## IV.    SUMMARY OF THE ARGUMENT

KBR's aims at five elements of the claim. The Complaint plausibly pleads each one.

**A.       Procurement.** The Complaint alleges that KBR's counsel acted as DOJ's "outsourced investigatory arm" and induced DOJ to embrace four false propositions that set Khoury's prosecution in motion. Compl. ¶¶ 42, 52, 58.

**B.       Innocence and Probable Cause.** The Complaint alleges that Khoury earned below-market commissions for real work that generated billions for KBR, that KBR alone decided whether to pursue any opportunity, and that Stanley later extorted a portion of those already-earned commissions. Compl. ¶¶ 3, 7-8, 28, 32-33, 46, 53-57, 65.

**C.       Malice.** The Complaint alleges that KBR wanted the posture and profits of victimhood: $10.8 million in criminal restitution, maximum cooperation credit, and escape from more than $20 million in commissions. Compl. ¶¶ 11, 50-51, 64, 71, 75.

**D.       Damages.** The Complaint alleges Interpol notices, passport seizures, travel and banking restrictions, more than $8.102 million in defense costs, and lost earning capacity during the case's long pendency. Compl. ¶¶ 60-63, 74-76.

## V.    STATEMENT OF FACTS

KBR built and sold a theory that Khoury had joined Stanley in a kickback conspiracy, though KBR knew that theory was false. Once KBR learned that Stanley had extracted payments from commissions Khoury had already earned, it began shaping the opposite story: that Khoury and Stanley had conspired to siphon company money. Compl. ¶¶ 6, 8. That story was embedded

3

in Stanley's Information and Plea (*id.* ¶ 48) and, as the Complaint alleges, was actively "manufacture[d] and support[ed]" by KBR so Khoury could be cast as a co-conspirator. *Id.* ¶ 49.

KBR caused DOJ to adopt several false assumptions, without which the prosecution would not have proceeded. *Id*. ¶¶ 52, 58. By commission and omission, KBR led DOJ to think Khoury was part of a scheme to obtain unearned commissions, pressed that narrative despite contrary facts, and profited from the narrative even though it knew Khoury's work was legitimate, valuable, and paid at or below market rates approved by multiple executives. *Id.* ¶¶ 7, 32, 33, 49, 53–57, 65, 68-69. The center of gravity was KBR's internal investigation by Baker Botts, which functioned as DOJ's "outsourced investigatory arm." *Id.* ¶ 42. Through that process KBR led DOJ to believe four false propositions: (1) Khoury's work did not merit the commissions paid, (2) Stanley alone awarded the commissions, (3) Stanley steered projects to Khoury, and (4) the commission amounts were manufactured to enrich Stanley and Khoury at KBR's expense. *Id*. ¶ 52.

KBR "well knew" the commissions were legitimate and approved by multiple executives, that its own executives recognized the commissions as below market, and that the commissions were approved only after Khoury had already rendered the consulting services. *Id.* ¶¶ 7, 32, 33, 53. KBR also retained unilateral control over bidding and could accept or reject the projects Khoury brought it. *Id*. ¶¶ 28-29, 53. KBR thus knew the facts cut straight against any conspiracy, and its own investigation uncovered no evidence of steering or wrongdoing. *Id*. ¶¶ 49, 53. Khoury's consulting relationship continued successfully after Stanley retired, executives other than Stanley approved the service agreements, and KBR internally recognized both Khoury's strong reputation and the value of his work. *Id*. ¶¶ 54-56. After Stanley's tenure, KBR even entered two more project-specific agreements with Khoury's firm at commissions of 2% to 5% (*id*.) – more than double the Stanley-era rates – undercutting any claim that Stanley's favoritism caused KBR to

4

overpay Khoury or that the relationship depended on Stanley's influence. *Id.* ¶ 54.

Khoury's work was valuable. For over twenty-five years, moving from employee to consultant, he helped build KBR's liquefied natural gas ("LNG") business worldwide. *Id*. ¶¶ 2-3, 22. He identified engineering, procurement, and construction ("EPC") opportunities, generated billions in revenue, and earned recognition inside and outside KBR for his work. *Id*. ¶¶ 2-3, 7, 21, 36-39. He helped secure major projects; his consulting relationship spanned dozens of agreements and projects. *Id.* ¶¶ 21, 24-27. The commissions paid were 1% or less, consistently below industry standards, a point confirmed by former executives, including a KBR vice president who said a sub-1% commission on a multibillion-dollar project was "quite low" against an industry standard of 3–5%. *Id.* ¶¶ 31, 33, 35-37. Khoury's efforts helped KBR win multiple LNG megaprojects worth billions. *Id*. ¶ 39. KBR knew Khoury had generated enormous profits through legitimate work and that it had received full value for every commission it paid. *Id*. ¶¶ 57, 65.

The payments to Stanley were extortion, not conspiracy. *Id.* ¶ 46. KBR never acknowledged Stanley's abuse; instead, it clung to the story that Khoury and Stanley acted together to steal KBR's money and property. *Id*. ¶¶ 8, 45, 50. Stanley used his authority to demand money Khoury had already earned, while the investigations revealed Stanley's wider and deeply corrupt pattern of misconduct. *Id.* Stanley coerced $10.8 million in payments by threatening to blacklist Khoury in LNG circles. *Id.* ¶ 46. Stanley's influence waned after he retired. *Id*. ¶ 47.

KBR had both financial and strategic reasons to push the false narrative. It cast itself as the financial victim of an alleged conspiracy to seek restitution, to "quarantine" people associated with Stanley, and to justify severing ties with Khoury after lucrative projects had been secured. *Id*. ¶¶ 11, 50-51. KBR stood "shoulder-to-shoulder" with the government in claiming victim status, and also used that posture as a pretext to terminate Khoury's consulting agreements and withhold

payment for work Khoury had already performed. *Id*. ¶¶ 64, 69, 71. In the bargain, KBR claimed substantial financial benefits, including more than $20 million in unpaid commissions it avoided and $10.8 million in supposed restitution. *Id.* ¶¶ 11, 39, 51, 71.

The prosecution did grave damage to Khoury. In September 2008, DOJ filed Stanley's Information and Plea[2] and in November 2008 obtained a sealed indictment ("Indictment") charging Khoury with conspiracy to defraud KBR. *Id.* ¶¶ 52, 59, 63. The case wrecked Khoury's reputation and business, led to Interpol notices, passport seizure, effective confinement in Lebanon, and banking restrictions, and forced him to spend more than $8.102 million on his defense. *Id.* ¶¶ 12, 59-64, 74-76. After Stanley died and after Khoury's counsel exposed serious flaws in the prosecution theory, the Court dismissed the case with prejudice. *Id*. ¶¶ 10, 63, 66.

## VI.    ARGUMENT

### A. The Complaint Establishes that KBR Procured Prosecution by Knowingly Supplying False Information.

KBR, acting through outside counsel, procured Khoury's prosecution by feeding prosecutors falsehoods and half-truths and by building the prosecution around the four false propositions above. DOJ did not arrive at this theory on its own; KBR supplied it. These are concrete allegations about content, mechanism, and effect, and they fall comfortably within Texas authority recognizing procurement where a defendant knowingly furnishes false or misleading information that becomes the determining factor in the decision to prosecute. *Lieck* holds that "a person does not procure a criminal prosecution when the decision whether to prosecute is left to another, including a law enforcement official or the grand jury, *unless the person provides information which he knows is false.*" 881 S.W.2d at 292-93 (emphasis supplied). *King* confirms

---

[2] Stanley's admissions added rhetoric, not proof: they did not explain how KBR lost money or how Khoury's fees exceeded market or were otherwise unearned, and did not address that Khoury rendered services to obtain valuable project opportunities for KBR before any commission agreements were entered into. *See id*. ¶¶ 48, 52, 65, 68-69.

that procurement exists where a person expresses a desire "to have the proceedings initiated, expressed by direction, request or pressure of any kind," and that such direction or pressure is "the determining factor in the official's decision to commence the prosecution." 126 S.W.3d at 78. *Hill* synthesizes these principles into a two-prong test requiring both an express desire that is the determining factor and the knowing provision of material, false information that is acted upon. 2022 WL 3031603, at *9. KBR's alleged "victim" posture and restitution demand plausibly satisfy the first prong, and the four false propositions satisfy the second prong. Compl. ¶¶ 11, 51-53, 69.

KBR did not sign the charging instrument; it did something more useful. Through Baker Botts it supplied the narrative that made the prosecution possible. KBR ran an internal investigation designed to "get ahead of" DOJ's inquiry and then functioned as DOJ's "outsourced investigatory arm." *Id.* ¶ 42. KBR "provided the fuel" for the Stanley Plea narrative and the Khoury Indictment, and DOJ "could not have settled on its prosecution theory" without KBR's guidance using a set of facts that KBR knew – and its own records showed – was contrary to reality. *Id.* ¶¶ 42, 51-52, 58. Those allegations identify mechanism, timing, false content, and effect.

KBR cannot rebrand Stanley's later guilty plea as the "determining factor" in Khoury's prosecution. By then KBR had already supplied DOJ the theory echoed in Count 2 of Stanley's Information, his Plea, and the Khoury Indictment. *See United States v. Stanley*, No. 08-cr-597, R. Doc. 1 ("Information"), at 15–21; *id.* R. Doc. 9 ("Plea"), at 4, 6–7, 17–18. Count 1 of Stanley's Information – the Nigerian bribery charge, which was unrelated to Khoury – was the count in Stanley's case driving his exposure (and KBR's); Count 2 was comparatively minor. Khoury, by contrast, was prosecuted only on the unrelated Count 2 theory. Stanley therefore had every reason to accept Count 2's skeletal allegations to resolve his case and earn cooperation credit. His Plea ratified a theory KBR had already supplied; it did not generate a new one. Indeed, KBR appeared

7

at Stanley's sentencing to specifically argue that it was owed $10.8 million in criminal restitution.[3] But that was Khoury's (not KBR's) money and KBR knew that.

Nor is procurement defeated because DOJ was already investigating Stanley or KBR. A private actor still procures a prosecution when it hands the government the false narrative that supplies both theory and target. *See Gonzalez v. Grimm*, 479 S.W.3d 929, 935 (Tex. App.—El Paso Jul. 8, 2015, no pet.) (citing *Lieck*, 881 S.W.2d at 292–94); *Turner v. Roadway Exp., Inc.*, 911 S.W.2d 224, 226–27 (Tex. App.—Fort Worth Nov. 9, 1995, pet. denied). Where a private party runs the internal investigation and channels a selective story to prosecutors, the resulting prosecution is sensibly attributed to that party when the story is knowingly false. *Id.*; *see also Cameron v. City of New York*, 598 F.3d 50, 64–65 (2d Cir. 2010) (grand jury indictment does not bar malicious-prosecution claim where indictment was procured by false information). That is what Khoury alleges: through Baker Botts, KBR served as DOJ's "outsourced investigatory arm," curated the story, and supplied the information DOJ relied on to bring charges. *See* Compl. ¶¶ 42, 49, 51-53, 58, 68-69. Those allegations plausibly allege more than a good-faith report of suspected wrongdoing; they describe a knowingly false narrative that set the prosecution in motion.

KBR's reliance on *Smith v. Wal-Mart Stores, Inc.* misfires. Mot. at 10-11. *Smith* recognizes, in a different context, that "a failure to fully disclose details … is not equivalent to knowingly providing false information." 2019 WL 5457798, at *5 (S.D. Tex. Oct. 24, 2019). But Khoury pleads much more than silence. He alleges that KBR "helped manufacture and support a bogus narrative," that it "maliciously caused the DOJ to believe" four false propositions, and that it pressed that narrative despite knowing contrary facts about Khoury's work, KBR's approval process for consulting agreements, and market rates for consultants supporting LNG construction

---

[3] *United States v. Stanley*, No. 08-cr-597, R. Doc. 46, Sentencing Hearing Transcript, at 42:24-43:10.

8

projects. *See* Compl. ¶¶ 49, 52–53, 68–69. Under *Lieck*, affirmatively manufacturing and supplying falsehoods is procurement. 881 S.W.2d at 292–93.

The Complaint also satisfies *Hill*'s requirement that the false information be "acted upon in the commencement of the prosecution." 2022 WL 3031603, at *9. Baker Botts served as DOJ's "outsourced investigatory arm" (Compl. ¶ 42), KBR "provided the fuel" for DOJ's claims by causing DOJ to believe four false propositions (*id.* ¶ 52), and DOJ "could not have settled on its prosecution theory" without KBR's guidance through material misrepresentations and omissions. *Id*. ¶ 58. DOJ then commenced the prosecution. The pleaded sequence is linear, not mysterious: KBR supplied the story, DOJ acted on it, and Khoury was charged.

KBR's effort to polish its "victim" status fares no better. Khoury alleges that KBR stood "shoulder-to-shoulder" with DOJ and sought criminal restitution of $10.8 million from money Khoury had earned, all while withholding more than $20 million in commissions due him. *See* Compl. ¶¶ 11, 69, 71. Presenting itself as a victim in order to obtain restitution, cooperation credit, and relief from contractual obligations while pressing a false narrative is procurement.

**B. The Complaint Establishes Innocence.**

Texas requires actual innocence, not merely favorable termination. *Richey,* 952 S.W.2d at 517. A plaintiff can establish innocence of the charged offense by showing that one of its essential elements cannot be proved. *Tranum v. Broadway*, 283 S.W.3d 403, 413–14 (Tex. App.—Waco Jul. 2, 2008, no pet.). Khoury does that by pleading facts that negate the charged conspiracy and show the opposite of KBR's theory: he earned below-market commissions through valuable work, KBR retained control over whether to pursue any opportunity, Stanley later extorted a portion of those already-earned commissions, and KBR nevertheless received full value. Compl. ¶¶ 3, 7-8, 28, 32-33, 46-47, 53-57, 65. The structure of the consulting relationship between KBR and Khoury reinforces the point. Under the general consultancy agreements, Khoury's job was to originate

prospects and bring opportunities to KBR. *Id*. ¶¶ 26-27. Only if KBR chose to pursue the opportunity and later secured the work did a commission become due. *Id*. ¶¶ 28-29, 53. By the time KBR executed the agreements specifying commissions, it had already received the full value of Khoury's work. *Id*. ¶¶ 32, 65. There was therefore nothing for Stanley to "steer" to Khoury. Khoury was not overpaid and then kicking back excess value; he was paid below market, and Stanley later extorted part of those already-earned commissions.

Those facts defeat both any secret contract-steering arrangement and any agreement to siphon unearned commissions. *Bailey, Quantlab*, and *Sutton* do not help KBR because Khoury does not rely on the fact of dismissal alone. *See* Mot. at 11-12 (citing *Bailey v. State*, 531 S.W.2d 628, 631 (Tex. Crim. App. 1976) (Onion, J., concurring); *Quantlab Techs. Ltd. (BGI) v. Godlevsky*, No. H-9-4039, 2012 WL 2577548, at *4 (S.D. Tex. July 3, 2012); *Sutton v. United States*, No. 99-20694, 2000 WL 1568222, at *1 (5th Cir. Sept. 19, 2000) (per curiam)).

KBR's argument that Khoury's admission of transferring $10.8 million to Stanley defeats innocence makes a basic mistake: it confuses payment with criminal intent. *See* Mot. at 12. The charged offense was conspiracy to defraud KBR through a kickback scheme requiring (1) an agreement between Stanley and Khoury to defraud KBR; (2) that Stanley would steer consulting contracts to Khoury; (3) that the commissions did not reflect what Khoury's work merited; and (4) unjust enrichment at KBR's expense. Plainly, an extortion victim is not a co-conspirator. Khoury also alleges that Stanley "had the power and influence to crush Mr. Khoury's career" and "used the long shadow cast by his power and influence to wrongfully claim money that Mr. Khoury had legitimately earned," so the transfers were coerced, not collaborative. Compl. ¶¶ 8, 46. Stanley was not merely a peer making requests; he was the CEO of one of the world's leading EPC firms, perched atop a small and specialized industry, and capable of blacklisting Khoury from major LNG

10

projects worldwide. *Id*. ¶ 46. It is no answer that the payments continued over several years. The coercive conditions persisted throughout Stanley's tenure, and Khoury's dependence on KBR made refusal tantamount to professional suicide. *Id*. ¶¶ 34, 46-47. The payments stopped once Stanley retired and his leverage faded. *Id*. ¶ 47. KBR received full value for work that "brought in billions of dollars of revenue" and paid "for services already performed." *Id*. ¶¶ 3, 65. When the alleged "victim" received full value, there is no fraud or unjust enrichment, regardless of whether a third party later extorted a share of those legitimately earned fees.

Stanley's admissions do not rescue KBR. Across the Stanley Information and Plea and the Khoury Indictment, DOJ repeatedly used the label "kickback," but never identified the quid pro quo that would make Khoury's commissions fraudulent. In responding to Count 2, Stanley did not admit that Khoury did no work, that Khoury's fees exceeded market, that Stanley changed contract terms for Khoury's benefit, that Stanley bypassed required approvals, or that KBR paid for services it never received. In short, Stanley's admissions failed to establish any of the four false propositions KBR fed DOJ and that became the foundation of the Khoury Indictment.[4]

KBR's reliance on Judge Ellison's observation that Khoury remained in Lebanon while the Indictment was sealed does not defeat innocence. *See* Mot. at 12. First, KBR omits that Judge Ellison found only that Khoury *suspected* an indictment, not that he knew the charges, and further held that he was not a fugitive because the sealed indictment left him no way to submit to custody. *United States v. Khoury*, No. 4:08-cr-00763, 2019 WL 6687715, at *4 (S.D. Tex. Dec. 6, 2019); *United States v. Khoury*, No. 4:17-MC-2553, 2018 WL 2864413, at *3 (S.D. Tex. June 11, 2018). In any event, the Complaint alleges Khoury returned to Lebanon in 2004 to care for his parents –

---

[4] As Khoury's counsel later explained to DOJ, Compl. ¶ 10, the Indictment was defective: it alleged no quid pro quo or antecedent agreement between Stanley and Khoury, no false statement by Khoury to KBR about his qualifications or work, no inflation in Khoury's fees, and no loss of money or property by KBR as a result of Stanley's extortion.

four years before the Indictment – and that the sealed Indictment left him no meaningful way to surrender or challenge charges he could not access. Compl. ¶¶ 61, 63. The Court must accept Khoury's allegations as true; factual disputes about motive do not belong in a motion to dismiss. *See Connolly v. Deutsche Bank AG*, No. 22-CV-9811 (JMF), 2023 WL 7168314, at *1 (S.D.N.Y. Oct. 31, 2023) (denying motion to dismiss malicious prosecution claim because defendant's "arguments are premised on factual disputes that cannot be resolved at this stage of the litigation").

Finally, KBR suggests the 2024 dismissal occurred only because Stanley died. Mot. at 12-13. Under Texas law, the reason for dismissal goes to favorable termination, not innocence, and as shown above, Khoury pleads independent facts negating the conspiracy and establishing innocence. *See Richey*, 952 S.W.2d at 517. That the case collapsed after Stanley's death only sharpens the point. If Khoury had really been a sham consultant siphoning off unearned millions of KBR's property, one would expect objective proof – or at least one corroborating witness from the many dozens of KBR personnel who had worked with Khoury over more than two decades. The public record identifies none. If DOJ had that proof, Stanley's death would not have ended the case. The dismissal after Stanley's death supports the reasonable inference that Stanley's Plea added no independently corroborated facts beyond the story KBR had supplied.

### C.  The Complaint Establishes the Absence of Probable Cause.

Texas courts measure probable cause by "whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Richey*, 952 S.W.2d at 517; *accord Akin*, 661 S.W.2d at 921. The inquiry turns on KBR's actual knowledge, not the grand jury's later view. *Metzger v. Sebek*, 892 S.W.2d 20, 42 (Tex. App.—Houston [1st Dist.] Sept. 19, 1994, writ denied). Before the prosecution began, KBR knew that Khoury's work had generated billions for KBR; that his commissions were below market; that multiple KBR executives – not Stanley alone

12

– approved the relevant consulting agreements after Khoury performed the services that generated the revenue; that KBR retained unilateral control over whether to pursue any project bid; and that Stanley had for years been directing widespread bribery and corruption to line his own pockets. Those allegations, taken as true, are incompatible with an honest and reasonable belief that Khoury joined a kickback scheme to obtain unearned commissions.

KBR cannot use the Indictment itself as a shield. *See* Mot. at 13-14 (citing *Ex parte Plumb*, 595 S.W.2d 544, 545 (Tex. Crim. App. 1980)). In a civil malicious-prosecution case, an indictment offers no shelter where the defendant procured it by knowingly supplying false information. *Lieck*, 881 S.W.2d at 293; *Cameron*, 598 F.3d at 64–65. The probable-cause inquiry remains tied to the complainant's own knowledge and beliefs, and that is incompatible with a rule allowing the defendant to substitute the grand jury's belief for its own knowledge. *Richey*, 952 S.W.2d at 517. Here the Complaint alleges that Baker Botts served as DOJ's "outsourced investigatory arm," that KBR caused DOJ to believe the four propositions that became the foundation of the Indictment, and that DOJ would not have prosecuted Khoury without KBR's misrepresentations and omissions. Compl. ¶¶ 42, 52, 58. The Indictment cannot cleanse KBR's knowledge or excuse KBR's role in obtaining it.

KBR's separate reliance on *Richey*'s presumption of good faith fares no better. Mot. at 14. The presumption is rebuttable, and at the pleading stage Khoury need only allege facts permitting a reasonable inference that KBR's own motives, grounds, and beliefs did not support probable cause. *See Richey*, 952 S.W.2d at 518. "Evidence of motives that undermine the presumption of reasonable belief include prior bad relations, preexisting debt, racial animus, or any private motivation to harm." *S. Texas Freightliner, Inc. v. Muniz*, 288 S.W.3d 123, 134 (Tex. App.— Corpus Christi Mar. 12, 2009, no pet.) (citing *Suberu*, 216 S.W.3d at 795); *McShirley v. Lucas*,

13

No. 02-23-00229-CV, 2024 WL 976512, at *10 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied) (same). The Complaint does just that: it alleges that KBR knew Khoury had been recognized for meritorious work; that a panel of KBR executives reviewed each project he proposed and decided whether KBR would pursue it; that at least four KBR officers approved each success-based commission required by the consulting agreements; that KBR's vice president described the commissions as "quite low"; and that KBR nonetheless persisted in reporting the kickback narrative to DOJ. Compl. ¶¶ 7, 28, 32-33, 69. Khoury further alleges that KBR owed him more than $20 million in unpaid commissions and wanted to appear cooperative to avoid harsher DOJ punishment for its FCPA violations. *Id.* ¶¶ 11, 39, 43, 49-51, 75. Those allegations rebut a presumption of good faith.

KBR's fallback point – that a reasonable person would have viewed the $10.8 million in "secret payments" as "some form of illegal scheme," Mot. at 15 – abstracts the payments from the facts KBR actually knew: that Stanley extorted money from commissions Khoury had legitimately earned (Compl. ¶¶ 8, 46); that the payments surfaced as KBR was learning of Stanley's broader corrupt conduct as CEO (*id.* ¶¶ 42-45, 51); that KBR knew the commissions paid for Khoury's services were below market and the project-specific consulting agreements were approved by multiple KBR executives only after services were fully rendered (*id.* ¶ 53); and that KBR received full value in exchange for what it paid. *Id.* ¶ 65. Under *Richey* and *Akin*, probable cause cannot rest on generalized suspicion severed from the pleaded facts. *Richey*, 952 S.W.2d at 517; *Akin*, 661 S.W.2d at 920-21. On the facts known to KBR, a reasonable person could not honestly conclude that Khoury was unjustly enriching himself at KBR's expense through a conspiracy with Stanley.

KBR argues the Indictment does not focus on the value of Khoury's services, the terms of his consulting agreements, or his general character. Mot. at 10 n. 5. That is the problem. In a case

14

premised on KBR's supposed losses through "kickbacks," those facts are central. KBR supplied the four false propositions that made DOJ's case possible. Without them, DOJ had no case against Khoury. It is telling that the Indictment can muster the theory only in its vaguest form, omitting any concrete facts explaining why Khoury's services were fictitious, the basis on which his commissions could be judged above-market or unearned, or how Stanley supposedly used unilateral authority to award the agreements. DOJ could not allege those specifics because the truth ran the other way – truth KBR knew from the start and DOJ eventually recognized when it agreed to dismiss the case. The Indictment concretely alleges only this: KBR paid for Khoury's services under consulting agreements, and Khoury later paid Stanley. That is not enough to support an honest and reasonable belief that Khoury defrauded KBR.

Khoury plausibly alleges that KBR lacked probable cause under the facts it actually knew. KBR cannot hide behind the Indictment or the presumption of good faith when the Complaint alleges that it procured the prosecution through material misrepresentations and omissions.

### D.  The Complaint Establishes Malice.

KBR knowingly pushed a false narrative to maximize perceived cooperation with DOJ, to cast itself as a victim and collect $10.8 million in restitution, and to avoid more than $20 million in commissions – conduct that at the very least reflects reckless disregard of Khoury's rights. Texas law allows malice to be shown by proof that a defendant acted intentionally or with reckless disregard for another's rights, and that showing may rest on circumstantial evidence, including motive, lack of probable cause, and failure to disclose material information. *See French v. French*, 385 S.W.3d 61, 69 (Tex. App.—Waco Jul. 29, 2012, pet. denied) (defining malice as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others"); *Thrift v. Hubbard*, 974 S.W.2d 70, 80 (Tex. App.—San Antonio Feb. 25, 1998, pet. denied) ("Malice may be established by either direct or circumstantial evidence."); *Digby v. Tex. Bank*, 943 S.W.2d 914, 922–23 (Tex.

15

App.—El Paso Mar. 6, 1997, writ denied) (citations omitted) ("Texas courts have consistently held that a plaintiff alleging malicious prosecution does not have to produce direct evidence of malicious intent … the absence of probable cause, or the failure to make full and fair disclosure, can provide circumstantial evidence of a hostile or malicious motive."); *Hernandez v. Mendoza*, 406 S.W.3d 351, 357 (Tex. App.—El Paso Jul. 3, 2013, no pet.) (same); *Alamo Country Club Owners Ass'n v. Shelton*, 2012 WL 3792753, at *12 (Tex. App.—Corpus Christi Aug. 31, 2012, no pet.) (quoting *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas Sept. 8, 2000, no pet.)) (malice is shown where "the defendant committed wrongful acts in reckless disregard for another's rights and with indifference as to whether the party would be injured." (internal quotation marks omitted); *Tranum*, 283 S.W.3d at 418 (same); *Richey*, 952 S.W.2d at 519 (holding that "failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are relevant to the malice  . . . element[] of a malicious prosecution claim"); *Guernsey Community Federal Credit Union v. Gonzalez*, 539 S.W.2d 896 (Tex. App.—El Paso 1976, writ ref'd n.r.e.) ("it is generally agreed that the lack of probable cause may give rise to an inference of malice").

Khoury's allegations plausibly support the inference of malice. KBR was not a disinterested complainant making a good-faith report of suspected wrongdoing. *Cf. Richey*, 952 S.W.2d at 516-17 (grocery store reporting suspected shoplifting). KBR portrayed itself to DOJ as a "victim" while facing substantial financial exposure and reputational harm from unrelated FCPA violations. In claiming victim status, KBR sought to maximize its perceived cooperation with DOJ, procure $10.8 million in restitution that Stanley stole from Khoury's earnings, and avoid more than $20 million in commissions it owed Khoury. Compl. ¶¶ 11, 49-51, 64, 71, 75. It therefore had a concrete reason to depict Khoury as culpable even though, as alleged, the facts pointed the other

16

way. Texas law allows malice to be inferred from exactly this sort of conduct.

KBR's arguments do not defeat the inference of malice. *See* Mot. at 21. A corporation may plead guilty while still trying to reduce its own criminal exposure by shifting blame to specific individuals and styling itself the victim. *See generally United States v. Stein*, 541 F.3d 130, 149-51 (2d Cir. 2008) (describing corporate cooperation pressures and risks to individuals). Nor are the Complaint's allegations about KBR's motive to malign Khoury speculative or illogical. *See* Mot. at 4. KBR agreed to pay commissions on successful projects it chose to bid and then withheld approximately $10 million on the Yemen project, $10 million on the Indonesia Tangguh project, and $400,000 on the JUPC Ethylene project. Compl. ¶¶ 26-30, 75. Those allegations make the economic motive concrete: by portraying Khoury as Stanley's co-conspirator, KBR could seek restitution and avoid commissions it otherwise owed. *Id.* ¶¶ 11, 51, 71, 75.

Taken together, the allegations support a plausible inference that KBR advanced a blame-shifting narrative not to report wrongdoing in good faith, but to buy cooperation credit, recover money, and escape contractual payment obligations despite knowing facts that undercut its story. At the pleading stage, that is enough to plead malice.

### E.  The Complaint Establishes Damages.

Texas requires damages "as a result of the prosecution." *Thrift*, 974 S.W.2d at 77. The Complaint pleads them in detail. Based on the Indictment, DOJ issued Interpol diffusions in 2009 and 2015 and a red notice in 2019 (Compl. ¶ 61); Lebanese authorities seized Khoury's passports and barred travel, and they restricted his ability to open bank accounts because Interpol formally told them he was the subject of a U.S. criminal case (*id.* ¶¶ 61-62); Khoury was effectively confined to Lebanon for more than fifteen years (*id.*); he spent at least $8.102 million defending against the Indictment (*id.* ¶ 74); he lost $10.8 million that belonged to him when KBR submitted a "restitution" claim grounded in the false narrative that produced the Stanley Plea and the

17

Indictment; he lost the $20 million in commissions KBR still owed him; and he lost his livelihood. *Id*. ¶¶ 60, 71. These are not merely the bruises of bad publicity. They are governmental restraints and concrete expenses flowing from the criminal case itself.

Just as important, the Stanley Plea and the Khoury Indictment were not independent events producing neatly severable harms. They were sequential expressions of the same false narrative KBR manufactured and supplied to DOJ. Count 2 of Stanley's Information, describing the alleged kickback conspiracy with the "LNG Consultant," is the same conspiracy charged in the Khoury Indictment. Both charging instruments rest on the same four false propositions. The Indictment was not an unforeseeable bolt from the blue; it was the formal charging consequence of the story KBR supplied. To the extent KBR argues it did not itself issue Interpol notices or seize passports, that misses the point. Khoury alleges those restraints followed from DOJ's filing and maintaining the Indictment that KBR procured. Compl. ¶¶ 61-63. Malicious-prosecution damages need only result from the prosecution, not from some other act personally performed by the complainant or his associates. *Thrift*, 974 S.W.2d at 77; *Zess*, 956 S.W.2d at 93; *Compton v. Calabria*, 811 S.W.2d 945, 949 (Tex. App.—Dallas May 13, 1991, no pet.); *Ada Oil Co. v. Dillaberry*, 440 S.W.2d 902, 910 (Tex. App.—Houston [14th Dist.] Apr. 9, 1969, writ dism'd w.o.j.); *McShirley*, 2024 WL 976512, at *12 (citing *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 202 (Tex. 2023)) (holding that allegations of damages from loss of reputation, mental distress, and costs of defense were sufficiently plead to allow a "rational inference that some damages naturally flowed from the alleged [malicious prosecution]"). The same is true of defense costs and lost earning capacity. *See* Compl. ¶¶ 74-76. Where, as here, one false narrative triggers successive government actions over time, the resulting harms satisfy *Thrift*'s causation requirement.

KBR's effort to date all harm to Stanley's Plea therefore fails. Even if some injury began

18

when Stanley's Plea effectively identified Khoury, it was KBR's false narrative to DOJ that set the Plea and Khoury's resulting injury in motion. More importantly, the Indictment triggered a distinct and independently sufficient set of prosecution-caused harms that Stanley's Plea alone could not have produced: international law-enforcement notices, passport seizure, banking restrictions, years of immobility, continuing defense costs, and lost earning capacity during the life of the case. Compl. ¶¶ 60-63, 74-76. Stanley's Plea was a public filing that identified Khoury by description; the Indictment was the formal criminal charge that set in motion the machinery of domestic and foreign law enforcement against him. *See id*. ¶¶ 61-62. The Complaint also pleads that, absent KBR's procurement of the prosecution, Khoury would have continued earning at least at the level reflected by the commissions yielded in the pre-prosecution record – approximately $36.229 million in paid commissions and $20.4 million in documented unpaid commissions. *Id.* ¶¶ 75-76. Those allegations comfortably satisfy Rule 8.

### F.  KBR's Pleading and Policy Objections Fail.

KBR's "no specific false statement" objection fails. Mot. at 9-10. Rule 8 does not demand verbatim quotations from communications uniquely within KBR's possession; pleading on information and belief is proper where those facts are peculiarly within the defendant's control or the inference of culpability is otherwise plausible. *See Innova*, 892 F.3d at 730. Here, Baker Botts served as DOJ's "outsourced investigatory arm" and ran the internal investigation that generated the prosecution narrative, so the particulars of KBR's communications with DOJ lie within KBR's knowledge and control. Compl. ¶¶ 42, 50-52. Even so, Khoury identifies the substance of the false information with considerable specificity: the four false propositions, the contrary facts KBR knew, and KBR's financial motives. *Id*. ¶¶ 32, 33, 49, 52-57. He further alleges that KBR "helped manufacture and support a bogus narrative" despite knowing the facts were "incompatible with reality" (*id*. ¶ 49), that it "affirmatively and/or by deliberate omission led the DOJ to believe"

19

Khoury conspired with Stanley (*id*. ¶ 68), and that it "encouraged and supported the 'kickback' narrative" while standing "shoulder-to-shoulder with the DOJ." *Id*. ¶ 69. That is more than enough under Rule 8; it pleads affirmative procurement, not passive silence.

KBR's suggestion that scapegoating Khoury would have been irrational because KBR itself was under federal scrutiny ignores how federal criminal investigations actually work. *See* Mot. at 4. Khoury alleges that, precisely because KBR faced its own exposure, it had reason to maximize cooperation credit, portray itself as the victim, "clean house" of people associated with Stanley, seek restitution, and avoid more than $20 million in outstanding commissions. Compl. ¶¶ 11, 50-51, 64, 71. Those allegations make scapegoating more plausible, not less.

Finally, KBR's policy argument does not justify dismissal. *See* Mot. at 6-7. Texas already balances the public interest in reporting crime against the need to protect individuals from unjustifiable prosecution by requiring a plaintiff to plead procurement, lack of probable cause, and malice. *Suberu*, 216 S.W.3d at 792. Khoury alleges the knowing manufacture of a false narrative by a company seeking restitution, cooperation credit, and escape from commissions it owed. Compl. ¶¶ 11, 49-51, 64, 71, 75. A sophisticated corporate defendant under federal criminal scrutiny that furnishes a false narrative leading to an Indictment, positions itself as the alleged "victim" to obtain restitution, and avoids tens of millions in contractual obligations stands in a very different posture from a disinterested yet mistaken citizen reporting suspected wrongdoing. Imposing liability on a party that knowingly supplies false information will not chill good-faith reporting by real victims; it will deter abuse of "cooperation" as a way to scapegoat the innocent.

## VII.   CONCLUSION

For these reasons, Khoury respectfully requests that the Court deny KBR's Motion to Dismiss. Alternatively, Khoury requests leave to amend before any dismissal with prejudice.

20

Dated: March 26, 2026

Respectfully Submitted,

**FISHMAN HAYGOOD, L.L.P.**

*/s/ Benjamin D. Reichard*
Benjamin D. Reichard
Attorney-In-Charge
Texas Bar No. 24098693
breichard@fishmanhaygood.com
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Tel: (504) 586-5252
Fax: (504) 586-5250

and

**KHALIL LAW PLLC**

Samy Khalil
Texas Bar No. 24038997
samy@khalil.law
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
Tel: (713) 904-4477
Fax: (713) 565-9915

*Counsel for Plaintiff Samir R. Khoury*

## CERTIFICATE OF SERVICE

I certify that on March 26, 2026, a true and correct copy of the foregoing instrument was served via the Court's CM/ECF system on all parties requesting notice to this proceeding.

*/s/ Benjamin D. Reichard*

21